|,H. CHARLES GAUDIN, J. Pro Tem.
Houston Jackson, Samuel Kelly and Nathaniel Culverson were each convicted in Jefferson Parish of second degree murder and conspiracy to commit armed robbery. The victim was the night manager of Chili’s Restaurant on West Esplanade Avenue in Kenner, Louisiana, who was shot and killed in the early morning hours of December 21,1997.
The six-day joint trial of all three defendants began on November 2, 1998. A 12-person jury unanimously found each defendant guilty of the two counts.
Jackson, Kelly and Culverson filed separate appeals, contending that the evidence did not support the guilty verdicts and that the trial judge committed various other itemized errors, necessitating reversal.
We find, after considering the evidence and testimony, that there were no reversible errors. The convictions and sentences are affirmed.
Each appellant specified these district court errors:
(1) the evidence was insufficient,
(2) the trial judge mistakenly allowed written statements of two witnesses, Travis Robinson and Donald Collins, to be used and admitted as evidence, and
(3) the sentences were excessive.
In addition, Jackson, Kelly and Culver-son alleged other trial court errors mainly pertaining to each defendant individually.
Jackson argues the trial judge erred (1) in failing to suppress evidence of a pistol pawned by him and (2) for denying a request for a mistrial after repeated references to inadmissible hearsay elicited by the prosecutor.
| ¡.Kelly contends it was error (1) for the trial judge to permit into evidence photographs of a red-looking automobile and (2) for denial of a continuance due to unavailability of a witness.
*486 Culverson says the trial judge erroneously allowed into evidence the red book kept by managers of Chili’s restaurant.
THE MURDER
Ms. Jennifer Luttrell was the manager of Chili’s restaurant on West Esplanade Avenue in Kenner, Louisiana, when she was shot and killed in the early morning hours of December 21, 1997. Ms. Luttrell had worked the evening shift at the restaurant, which was from 3:30 p.m. until closing. Alarm records indicate that Ms. Luttrell closed the restaurant and set the alarm at 1:54 a.m.
Between 1:54 a.m. and 1:55 a.m., the alarm monitoring company, Honeywell, received three alarms. Mary Brown, the team leader for the data integrity division of Honeywell, testified that the first alarm was set off by the infrared motion detector, the second alarm was set off by an interior door and the third alarm was tripped by an outside door. Ms. Brown stated that all three alarms were restored, meaning that whatever caused the alarms to go off went back to a normal condition, such as when an open door is closed.
The cleaning crew, Frank Kerner and Bonnie Kerner, arrived at Chili’s between 2:15-2:20 a.m. on December 21, 1997. Kerner testified that upon arrival he noticed Ms. Luttrell’s car parked at an unusual angle in the parking lot. As he approached the door of the restaurant, he saw papers scattered on the floor inside and knew something was wrong.
Once inside, he found Ms. Luttrell on the floor bleeding but still alive. Despite medical attention, Ms. Luttrell died of a gunshot would to the back of her head.
Detective Chad Jacquet of the Kenner Police Department was the first officer on the scene, arriving at approximately 2:30 a.m. He called for an | sambulance and secured the area. Jacquet did not see any signs of forced entry into the restaurant. He noted that Ms. Luttrell was still wearing her jewelry consisting of her wedding ring, earrings and a gold chain. Her purse was on the serving area and her keys were next to her on the floor. No money was missing from the restaurant safe.
Detective Michael Cunningham of the Kenner force arrived at 3:30 a.m. and was primarily responsible for the subsequent investigation, during which all employees of Chili’s were interviewed. Culverson, a cook at the restaurant, had worked a double shift on December 20th, the second shift ending at 10:52 p.m. He became a suspect when the statement he gave Cunningham on December 21st conflicted with information contained in the managers’ red book. The red book was used by managers to communicate with each other regarding activities or incidents which occur during each shift. Entries are made only by the managers.
Culverson told Cunningham that he did not have any disagreement with Ms. Lutt-rell during his two shifts on December 20th. However, an entry Ms. Luttrell made in the managers’ red book indicated that she had problems with Culverson and another employee during the evening shift.
Over the next three months, Cunningham continued to investigate the murder. He learned that Culverson and Kelly had planned to rob the restaurant and that Jackson was involved in the plan. He obtained information that they intended to rob the restaurant by holding a gun to the manager’s head and forcing her to open the safe. On April 3, 1998, Cunningham obtained arrest warrants for all three defendants.
ASSIGNMENT NO. 1
Jackson, Kelly and Culverson contend in this assignment of error that the *487 testimony and circumstantial evidence were not sufficient proof of second degree murder or a conspiracy to commit armed robbery.
|4The constitutional standard for testing the sufficiency of evidence requires that the evidence, direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt, in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When a case is prosecuted on circumstantial evidence, every reasonable hypothesis of innocence must be excluded assuming every fact to be proved that the evidence tends to prove. See LSA-R.S. 15:438 and State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78.
The requirement of LSA-R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt.
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. See State v. Shapiro, 431 So.2d 372 (La.1982).
Second degree murder, LSA-R.S. 14:30.1(A), is the killing of a human being when the offender (1) has specific intent to kill or to inflict great bodily harm or (2) is engaged in the perpetration or attempted perpetration of armed robbery (and other listed felonies) even though he has no intent to kill or to inflict great bodily harm.
The elements of the crime of conspiracy, LSA-R.S. 14:26, are (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, and (2) an act done in furtherance of the object of the agreement or combination.
Armed robbery, LSA-R.S. 14:64, is the taking of anything of value belonging to another from the person of another or that is in the immediate | ^control of another, by use of force or intimidation, while armed with a dangerous weapon.
LSA-R.S. 14:24 defines a principal as one concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.
The first element of conspiracy requires specific intent which is defined in LSA-R.S. 14:10 as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Intent may be inferred from the circumstances of the transaction and the actions of the defendant. The overt act required in the second element of conspiracy need not be unlawful. It may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance of its object, reference State v. Richards, 426 So.2d 1314 (La.1982) and State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828. Proof of a conspiracy may be made by circumstantial evidence, as stated in State v. Zeno, 99-69 (La.App. 5 Cir. 8/31/99), 742 So.2d 699.
The crucial, damaging evidence against the three defendants was circumstantial. There were no eye witnesses, no fingerprints. The murder weapon was never found.
At trial, Detective Cunningham, while his investigation was in progress, testified *488 that Chili’s and Crime Stoppers offered a $12,000.00 reward for information regarding the murder. Posters were “passed out” in various Kenner neighborhoods.
On March 16, 1998, Cunningham took a statement from Robinson, who was then employed as a security guard at a Benson automobile dealership. Robinson said that “about two weeks” before the Chili’s murder he was at Culverson’s house and overheard a conversation between Culverson, whom IfiRobinson called “Bo,” Kelly and another man, Kelly’s cousin, name unknown to Robinson.
From the statement:
Q: So how did the conversation begin?
A: Well I walk in the apartment and Bo, Sam, and Sam’s cousin were talking and I hear Bo say something about 10 G’s.
Q: What do you mean by 10 G’s?
A: Ten thousand dollars.
Q: Then what happened?
A: Bo says about the 10 G’s and I asked him what about 10 G’s. Bo said where he works at they got a safe with a lot of money in it and there’s either a lady in there by herself in the morning early or there only be one person in there with her. Bo said it would be an easy lick. Bo said he knows that about the lady because he used to work that shift. Then Bo said if you put her at gunpoint she’s going to open the safe. Then Sam said thats going to be an easy lick in and out.
Q: When you say Lick what do you mean?
A: Quick jack a robbery.
Q: So Bo said that there is a lot of money in the safe and that a lady would be in there by herself?
A: Yes.
Q: And he said he knows this because he used to work that shift?
A: Yes.
Q: And Bo said if you put her at gunpoint she would open the safe?
A: Yeah.
Q: Sam was the one who said that it would be an easy Lick in and out?
A: Sam said a walk in and walk out.
Q: Is there anything else you know about the murder?
A: About two days after they were talking about the Chili’s Lick we was standing outside of Bo’s apartment and they were talking about robbing some people in LaPlace.
Who was with you this time?
Me, Bo, Sam, and Derrick Dunbar.
Q What was said this time?
A Sam and Bo were talking about robbing some people in LaPlace and Sam said he had Chili’s all mapped out. Like he mapped out the setup.
Q: Anything else you are aware of?
A: About a day after the second time talking Derrick Dunbar told me he saw the map Sam was talking about.
Q: How did the conversation come about Chili’s when you were talking to Derrick Dunbar?
A: I asked Derrick if he thought they were serious about the Chili’s lick and Derrick told me they were because he said'Sam showed him the map.
Q: Is there anything else you are aware of about the murder?
A: Well the day after the murder I was picking up Donald Collins and I was talking to him and I told him I saw about the Chili’s murder on the news. I told Donald I thought Sam *489 and Bo did it and Donald told me that Sam and Houston came to his house last night looking for a gun.
Q: When you picked Donald Collins up the next day where were the two of you going?
A: We were going to church. Donald is on house arrest and the only time he can leave house is to go to church.
Q: And Donald told you that Sam and Houston came to his house to get a gun?
A: Yeah.
Q: Did he say if he gave a gun to Sam and Houston?
A: He said he didn’t have one to give them.
Q: Why would they go to Donald to get a gun?
A: Because he used to always carry one.
Q: Do you know where Donald lives?
A: On Miami place in University City.
Q: What’s Donald’s last name?
tA: Collins.
Q: Is there anything else you are aware of that might be related to the Chili’s murder?
A: About two weeks after the murder I saw Sam coming down 31st Street and I was talking to him. He said he was going to see Bo. That’s the last time I saw him.
END OF STATEMENT
Cunningham said that neither in his initial conversation with Robinson nor at the time the statement was given did Robinson ask for or even mention any reward money.
On August 24, 1998, Robinson spoke with an Assistant District Attorney and told him that the earlier statement to Cunningham was untrue. Then, the next day on August 25th, Robinson went to the Criminal Investigation Bureau and gave another statement in which he said that the March 16, 1998 statement was the truth. Robinson said that what he had said the previous day was not true and that he had made it because “I was scared...of someone taking my life.” Then, on August 25, 1998, Robinson again related all of the events and things he had told Cunningham on March 16, 1998, adding that Tanya Bailey, Culverson’s girlfriend, in addition to Culverson’s mother, had advised him to change his story implicating Culverson and the others. Tanya said, according to Robinson, “...just tell them you went in there to get the money and we’ll beat the case.”
The day following Robinson’s March 16, 1998 statement, Cunningham testified that he contacted Derrick Dunbar, who was among the state’s witnesses who testified at trial. Dunbar said that he had known Culverson for “about a year” and Kelly for five years. Dunbar said he was scared to go to court and testify; nonetheless, he said that about a week or two before the Chili’s murder he in fact was at Culver-son’s house and that he did overhear the very same conversation described by Robinson in his March 16, 1998 statement. Dunbar testified about Rhow Culverson and Kelly said they would carry out the Chili’s robbery by “putting the gun to her head” and forcing the manager “to do what they wanted her to do.” Culverson said he had been working at Chili’s for two weeks, “checking it out to rob.”
Dunbar said that “maybe a week before the robbery,” Culverson and Kelly asked him for a pistol, which Dunbar did not have.
At “about 12 o’clock to one o’clock” on the night of the murder, Dunbar said he was in a four-door red automobile with *490 Culverson and Kelly and heard them talking about robbing Chili’s. Culverson, according to Dunbar’s testimony, said he couldn’t do it because somebody might recognize him. Kelly responded by saying he “could get somebody else.” The car, Dunbar said, was Kelly’s.
Dunbar said he “got right back out” of the car and left, adding, “I didn’t think they were going” to rob Chili’s. In any event, Dunbar said, “I didn’t want to have anything to do with it.”
The next day, Dunbar stated, Culverson asked him if he had “seen the news” about the Chili’s murder. Dunbar said he asked Culverson, “Did he do it?” Culverson “nodded no and he smiled.”
Several weeks later, Dunbar said he spoke with Kelly, who had been picked up for questioning. Kelly, according to Dunbar, asked who “was telling on me.” Dunbar said Kelly had some bullets in his hand and he “throwed them in the tree.” Kelly told Dunbar he (Kelly) would find out who was telling on him.
Right before the trial, Dunbar testified that Culverson’s mother “came to my house one night when I was asleep” and asked him to tell the jury that his story was not true, that he had made up the story for the reward money.
Under cross-examination, Dunbar admitted that he had been contacted by Cul-verson’s attorney and that he had given a statement saying that Culverson had never talked about or planned any robbery and that what he had told the police was not true. Dunbar, however, said at trial that what he had told the |indefense attorney was not true. Earlier, under direct, Dunbar had said that he told Culverson’s attorney “another story” because he (Dunbar) didn’t know what to do and that he (Dunbar) was trying to get rid of him.
Standing alone, Dunbar’s testimony was serious proof of the guilt of the three defendants.
During his investigation, Detective Cunningham also spoke with and obtained statements from Donald Collins on March 17, 18 and 26, 1998. In the first statement, Collins said that on the night of the Chili’s murder, Kelly’s cousin came to his house looking for a gun. Kelly’s cousin said, according to Collins, that Kelly and Jackson were in the parked vehicle in front of the house, that they had a robbery planned and that they had two guns but needed a third.
Collins said on March 17th that he did not see Kelly and Houston, but in the March 18, 1998 statement he said that he had actually seen Jackson, in the front seat of Jackson’s blue Taurus station wagon, and Kelly in the passenger seat. The station wagon was parked on the curb, in front of Collins’ house.
Kelly’s cousin, Collins said, asked him to go on the “lick” (robbery) with them and that “they were going to get no less than 40 G’s.”
In the March 26, 1998 statement, Collins said:
“When I told you that Houston and Sam (Kelly) were in the car and that only Sam’s cousin came to my door well really all three of them came to my door.
[[Image here]]
“Sam and his cousin knocked on my door. Sam was asking me for a gun when Houston walked up to my door. Sam said that they had a Lick set on a white lady and they were going to get $40,000.00. Sam said if I get them a gun he would break me a little something. I told them I was under house arrest and I didn’t have a gun. Sam asked if I wanted to go and said that I *491 could go anywhere with the money. I told them I didn’t have gun and I could not go. That’s when my girlfriend came outside and told me to go inside.
[[Image here]]
Jjj'They said they already had two guns and needed a third.”
This request was made, Collins said, between 8 and 10 p.m. on the night of the murder at Chili’s.
Apparently Kelly did most of the talking to Collins. Jackson was present, however, and, according to Collins, “he (Jackson) brought them to my house in his car and he heard Sam talking about it...”
At trial, both Robinson and Collins repudiated their respective statements incriminating Culverson, Kelly and Jackson. Robinson testified that he had lied to Detective Cunningham on March 16, 1998 because he wanted the reward money and that he had lied to the assistant district attorney on August 25, 1998 because there were criminal charges pending against him (Robinson) and that he was afraid the assistant district attorney was going to have him jailed for a year until his trial came up. Collins testified that he had lied to Cunningham because the detective had threatened to bring criminal charges against him.
Collins testified that Jackson had not brought anyone to his house asking for a pistol. Shakeitha Cage, Collins’ girlfriend who was with Collins in his house the night of the murder, said that Collins had in fact spoken with someone, although she didn’t see that person, and that Collins had told her: “They asked me did I have a gun.”
Later, Cage said, Collins told her “Houston and them” had come for the gun.
Cunningham testified that Robinson and Collins had given statements voluntarily and that no pressure or threats were involved. The jury saw and heard Cunningham and all of the other witnesses. If jurors believed the testimony of Cunningham, Derrick Dunbar, Shakeitha Cage and other state witnesses and if the jury found that Robinson and Collins had told the truth when they initially implicated the three defendants in a criminal conspiracy to rob Chili’s, then proof of guilt was established beyond a reasonable doubt. Because Robinson and |1P,Collins were impeached with their prior inconsistent statements, the jury was free to determine their credibility on the stand, and could accept or reject the retractions of their earlier statements. See State v. Short, 00-866 (La.App. 5 Cir. 10/19/00), 769 So.2d 823, 828. It is not the function of an appellate court to reweigh the credibility of witnesses.
ASSIGNMENT NO. 2
Here, Jackson, Kelly and Culver-son argue that the prior inconsistent statements of Robinson and Collins should not have been admitted into evidence since both witnesses admitted giving prior inconsistent statements and that the prior inconsistent statements were improperly used as substantive evidence of the crimes rather than to merely impeach the witnesses. Appellants further argue that the trial court should have given limiting instructions to the jury regarding the purpose of the prior inconsistent statements.
LSA-C.E. art. 607 D(2) states, in pertinent part:
“... extrinsic evidence, including pri- or inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the *492 risks of undue consumption of time, confusing of the issue, or unfair prejudice.”
Robinson’s first statement, to Cunningham, was on March 16, 1998. On August 24, 1998, Robinson said he had fabricated the March 16th statement to collect the reward money. Then, on August 25, 1998, Robinson gave a third statement in the Criminal Investigations Bureau, which was taped.
In the third statement, Robinson claimed that his March 16, 1998 statement was the truth and he recanted the statement on August 24, 1998 because he was afraid. Also, in this statement, Robinson stated that Culverson’s girlfriend, Tanya Bailey, told him to lie and say he made up the story for the reward money.
lisAt trial, Robinson denied any knowledge of the Chili’s robbery and specifically denied ever hearing Culverson and Kelly talking about robbing Chili’s.
A copy of Robinson’s March 16th statement, with a portion deleted, was placed in evidence. His taped statement of August 25th was played for the jury with certain parts excised.
Collins also gave three separate statements prior to trial. In his first statement, March 17, 1998, Collins told Cunningham that Kelly, Jackson, and a third person (identified only as Kelly’s cousin) came to his house between 8:00 p.m.— 10:00 p.m. on the night of the murder looking for a gun in order to rob Chili’s. He stated that Kelly’s cousin came to the door and that Kelly and Jackson remained in the car parked on the street. Collins said he could not see Kelly and Jackson in the car.
In a second statement on March 18, 1998, which Collins said was basically the same as his first statement, he said that he actually saw Kelly and Jackson in the car.
In Collins’ third statement, on March 26, 1998, he stated that Kelly, Jackson, and Kelly’s cousin came to his door looking for a third gun to do a robbery on a white lady.
At trial, Collins could not recall a considerable portion of the substance of his statements but he did say that Kelly and Jackson never came to his house looking for a gun. Throughout his testimony, Collins repeatedly claimed that Cunningham threatened him and told him what to say. All three of Collins’ prior statements were admitted into evidence.
The record does not indicate and appellants do not contend that any statement was taken into the jury deliberation room.
A trial judge necessarily has wide discretion in allowing or refusing the use of prior | ^inconsistent statements to attack credibility. Inasmuch as both Robinson and Collins gave detailed trial testimony about the contents of the prior inconsistent statements and their respective reasons for having made the prior inconsistent statements, credibility became an important issue. The actual admission of the statements into evidence was not reversible error.
The trial judge did not give a jury instruction limiting the scope of prior inconsistent statements. If a defendant does not request such a limiting instruction, and none was asked for in this case, there is no error, State v. Allien, 366 So.2d 1308 (La.1978).
ASSIGNMENT NO. 3
All appellants believe their respective sentences were excessive.
Jackson was sentenced to 49 and a half years at hard labor as a habitual (second felony) offender, to run consecutive to the life sentence imposed for second degree murder. The sentences are to be *493 served without benefit of parole, probation or suspension of sentence.
The life sentence for second degree murder was statutorily mandated. Jackson was originally sentenced to five years for the conspiracy conviction, which was vacated. Under the habitual offender law, the sentencing range for a second felony offender shall be for a determinate term not less than one-half the longest term and not more than twice the longest term provided for a first conviction, LSA-R.S. 15:529.1(A)(l)(a). Jackson faced an enhanced mandatory minimum sentence of 24-3/4 years and an enhanced maximum sentence of 99 years.
Kelly was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, for the murder at Chili’s. The trial judge also imposed a five-year consecutive sentence for the crime of conspiracy to commit armed robbery, again without benefits. The state filed a habitual offender Bill of Information for enhancement of the sentence imposed for conspiracy to commit armed robbery, to which Kelly plead not guilty. The state later dismissed the enhancement bill.
|1sIn sentencing Kelly, the trial judge said:
“The Court takes notice that the defendant has been convicted of a felony in both instances. In one instance a felony of second-degree murder carries a mandatory sentence which the Court cannot suspend. The Court is of the opinion that there is an undue risk that if a suspended sentence were imposed that the defendant would commit another crime. The Court finds the defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution under the supervision of the State of Louisiana.
“The Court further takes notice that the offender knowingly caused the death of a citizen of this community and that the offense was committed under threats or actual violence. Further, that the offender used a dangerous weapon in the commission of the offense. The Court takes notice that whereas the defendant has no criminal convictions as an adult, he does have juvenile convictions.”
Culverson was sentenced to life imprisonment without benefits for the murder and to an enhanced sentence of 60 years at hard labor as a third felony offender, to run consecutive to the life sentence. Culverson had prior convictions for carnal knowledge of a juvenile and attempted carrying a firearm on school grounds.
Under LSA-R.S. 15:529.1(A)(l)(b)(i), Culverson’s sentencing range was from a minimum of 33 years to a maximum of 99 years.
Jackson, Kelly and Culverson contend that once life sentences were imposed, the adding of extra prison time was purposeless and was a needless imposition of pain and suffering. Whether the added years for conspiracy to commit armed robbery run consecutively or concurrently, the three defendants will remain in jail for the remainder of their lives unless they are pardoned; thus, remanding for re-sentencing under these circumstances would be an academic exercise which has no practical benefit. See State v. Franklin, 519 So.2d 292, 295 (La.App. 5 Cir.1988), citing State v. Mosley, 466 So.2d 733 (La.App. 4 Cir. 1985), writ denied, 468 So.2d 1202 (La.1985).
J^JACKSON’S ASSIGNMENTS
Jackson assigned two additional trial court errors. The district judge allegedly erred (1) in failing to suppress evidence of *494 a gun pawned by Jackson and (2) in denying a motion for a mistrial after repeated references to inadmissable hearsay evidence elicited by the prosecuting attorney.
Trial evidence showed that Jackson pawned a .38 caliber revolver on March 18, 1998 and reclaimed the gun five days later. This was not the murder weapon.
The pawning, Jackson argues, had no probative value and was used in the Chili’s trial only to suggest that he was a bad person in violation of LSA-C.E. art. 403.
The state’s theory of the Chili’s case was that the defendants had two pistols and needed a third. Jackson had said that he was on probation in December, 1997 and did not have a gun.
With some exceptions, all evidence which is relevant is admissible, LSA-C.E. art. 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, LSA-C.E. art. 401. LSA-C.E. art. 403 provides: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or waste of time.” The trial court is vested with great discretion in weighing the probative value of evidence with its potential prejudice, State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481.
In admitting the evidence, the trial court stated:
“I’m satisfied that a showing of the evidence supports that the gun should be presented. There is an issue before the jury as to whether or not the defendants, one [17or more of the defendants had in their possession at least two weapons and were seeking a third one. The weapon which is sought to be presented as I understand indicates that one of the defendants in fact had possession of a firearm... The court finds that any prejudicial harm that might result to any of the defendants is outweighed by the probative value.”
We see no abuse of discretion and therefore no error in the admission of evidence of the pawning.
Jackson further cites as trial court error the denial of a mistrial after references to hearsay. Jackson points to six incidents where hearsay was used, as follows:
(1) Opening statement, wherein the state referred to Cunningham’s hearing defendants names on the street.
(2) State’s direct with Travis Robinson, who testified Donald Collins told him “Houston came to get a gun from him.” Although the jury was instructed to disregard comments relative to Jackson and a gun, this information was then repeated via the tape recording played to the jury.
(3) After cross, and on redirect the state replayed the tape, playing portions of the tape the trial judge had ruled inadmissible.
(4) The state elicits from Cunningham that he came in contact with Jackson because of an interview with a subject. The trial court sustained the hearsay objection, denied the motion for mistrial and instructed the jury not to consider the testimony.
(5) Over defense counsel objection, the Court allowed Cunningham to testify regarding what Robinson told Cunningham he heard from Collins.
*495 (6) State elicits from Cunningham that Collins told him he failed to include Jackson’s presence at his house because Collins didn’t want to implicate Jackson in a crime. Defense counsel objected that this was not in Collins’ statement of March 26, 1998. Sustained by the trial court, then allowed state to clarify.
In the prosecuting attorney’s opening statement, he said that Detective Cunningham is “... going to tell you that in March he starts hearing the names of Houston Jackson, Samuel Kelly as well as Nathaniel Culverson.” Defendants objected and moved for a mistrial, which was denied after a bench conference at |iswhich the assistant district attorney said that he would call two witnesses, Robinson and Collins, who gave this information to Cunningham.
Three of the cited instances, (4), (5) and (6), occurred while Cunningham was testifying.
Cunningham was asked how he had come in contact with Jackson. Cunningham replied: “I had interviewed a subject...” Defendants objected and moved for a mistrial. The trial judge denied the motion and told the jury:
“The jury will disregard the testimony of the witness regarding any individuals that he might have spoken to and obtained information relative to Mr. Jackson. You will not consider that during the course of your deliberation.”
In incident (5), Cunningham contradicted Robinson’s in-court testimony. This was evidence of Robinson’s prior inconsistent statement.
The trial judge sustained the objection in (6) although the objection was not timely-
Regarding (3), the state asked Robinson what he said to Collins. Rather than answer this question, Robinson testified that Houston came to get a gun from Collins. The trial judge, as requested by the defense, instructed the jury to disregard this statement.
When Robinson’s taped statement was played for the jury, a part previously ruled inadmissible was played. The trial judge observed that the microphone had not been turned on when the inadmissible portion was played and that he did not know if the jury heard that portion or not. The trial judge immediately admonished the jurors not to consider the last question on the tape if they had heard it.
In most of the six instances, the trial judge sustained defendants’ objections and/or admonished the jury. In State v. Stephenson, 291 So.2d 767 (La.1974), the Louisiana Supreme Court found that a mistrial was not warranted by repeated attempts by the prosecution to elicit inadmissible hearsay where the |¶ atrial court sustained the objection of the defendant in instances complained of. The Supreme Court noted that no substantive evidence came in via hearsay. In State v. Richardson, 444 So.2d 664 (La.App. 1 Cir.1983), writ denied at 446 So.2d 313 (La.1984) and 93-2954 (La. 1/13/94), at 631 So.2d 1166, the First Circuit likewise found that a mistrial was not warranted where the trial court sustained the defendant’s objections, noting that any error was sufficiently corrected by sustaining the defendant’s objection.
The authority for a mistrial based on the prosecution’s repeated references to hearsay testimony is LSA-C.Cr.P. art. 775', which states that a mistrial shall be ordered, and in a jury case the jury dismissed, on motion of the defendant, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial; State *496 v. Stephenson, 291 So.2d 767 (La.1974). Mistrial is a drastic remedy and, except in instances in which mistrial is mandatory, is warranted only when trial error results in substantial prejudice to a defendant. The granting or denial of a motion for a mistrial is within the sound discretion of the trial court, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion.
Here, we cannot say that the trial judge’s discretion was abused in denying the mistrial motions or the defendants were denied a fair trial because of the six complained of instances.
KELLY’S ASSIGNMENTS
Kelly’s individual assignments of error pertain (1) to the trial judge’s allowing as evidence photographs of a red-looking car and (2) to the denial of a request for a continuance because a witness, a Kenner police officer, was not available to testify.
At trial, state witness Clare Ulow-etz said that she was working at the Lone Star Steak House close to Chili’s on the night of the murder. She was shown a photograph of a red car. Kelly admitted that he used to drive a red car belonging Unto his girlfriend. Derrick Dunbar testified that “about 12 o’clock to one o’clock” on the night of the murder, Culverson and Kelly were in a four-door red automobile. Ulowetz testified that at 2:10 or 2:15 a.m. she was waiting for friends to pick her up when she saw a red car with a black strip on the side go by at a fast rate of speed. Ulowetz could not say that Kelly’s girlfriend’s car was the one that she had seen on the night of the murder but she said: “It resembles it.”
Ulowetz said the speeding car had black wheels with no hub caps and that “it looked very beat up.” The car came from Ulowetz’s left, in the direction of Chili’s.
It was clear from Ulowetz’s testimony that the car she had seen on the night of the murder resembled the one in the photograph but there was no positive identification. The jury was not confused on this issue; consequently, if the trial judge abused his discretion and if there was error over the admission of the photograph, and we are not saying there was, the error was harmless.
The unavailable witness, identified as Officer J. Crier, had been involved in an off-duty accident and could not come to court. He had not been issued a subpoena although his name was on the Kenner police report as being one of the investigating officers at Chili’s the night of the murder.
Louisiana courts have uniformly held that if a party fails to issue a subpoena for a known witness, due diligence cannot be shown and that a request for a continuance based on unavailability of the witness is within the trial judge’s discretion. The trial judge here properly denied Kelly’s request for a trial delay.
CULYERSON’S ASSIGNMENT
Culverson assigns as error the trial judge’s admission into evidence Chili’s red book as being hearsay. Donnie Little, the general manager of Chili’s restaurant and Jennifer Luttrell’s supervisor, testified that the red book was kept by the various restaurant managers and that nobody else wrote in the book. Ms. I^Luttrell was the only manager on duty the night of December 20,1997 and in the red book she wrote:
“AC and Bo work together. AC and Bo together are horrible. They talked all night and ignored their expo trying to get Incha and they ignored me. Curtis, AC, Bo and Frank all thought that it was funny until I turned their music off.
*497 “Pulled Bo to the back to clean and ordered the rest to work. We need to get rid of him.”
Little said that he was familiar with Culverson as “Bo” and that he (Little) recognized the handwriting as being Ms. Luttrell’s.
LSA-C.E. art. 803(6) establishes the business record exception to the rule prohibiting hearsay, stating:
“The following are not excluded by the hearsay rule, even though the de-clarant is available as a witness:
“Records of regularly conducted business activity. A memorandum, report, record, or data compilation, in any form, including but not limited to that which is stored by the use of an optical disk imaging system, or acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity, to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule...”
The trial judge decided that a foundation had been laid sufficient to qualify Chili’s red book as an exception to the hearsay rule. This ruling was appropriate.
Culverson told Cunningham that he didn’t have any problems with his job at Chili’s. The red book indicates otherwise.
ERROR PATENT
All three defendants were advised that they had three years from the date the judgment became final to seek post-conviction relief. The three-year time | ai.period was correct at the time defendants were sentenced in December, 1998. However, LSA-C.Cr.P. art. 930.8 was amended to shorten the time period for filing of post-conviction relief to two years, effective August 15, 1999. This amendment is retroactive.
Accordingly, we remand to the trial court so that written notice of the two-year period from final judgment can be sent to each defendant and proof placed in the record that the notices had been received.

CONVICTIONS AND SENTENCES AFFIRMED; REMANDED ONLY FOR AMENDED ART. 930.8 NOTICES TO BE SENT TO EACH DEFENDANT.