SUSAN M. CHEHARDY, Judge.
li>On May 18, 2010, a Jefferson Parish grand jury indicted Jeremy Turner and two co-defendants with conspiracy to commit armed robbery, in violation of La. R.S. 14:26:64, and second degree murder, in violation of La. R.S. 14:30.1, of Cletis Jessie, Jr. (hereinafter “the victim”).[1] Defendant pled not guilty to the charges at arraignment.
On May 10, 2011, the four-day trial commenced. On May 13, 2011, a twelve-person jury unanimously found defendant guilty as charged as to both counts. On May 18, 2011, defendant was sentenced to consecutive terms of 40 years at hard labor without benefit of parole, probation, or suspension of sentence for conspiracy to commit armed robbery, and life imprisonment without benefit of probation, parole, or suspension of sentence for second degree murder.

Facts

On Saturday night, January 2, 2010, Jeremy Turner, Roddrick Petty, and Danarius Meredith were riding in Turner’s Lincoln Towncar on Center Street in | .¡Avondale, Louisiana. According to Turner, his car broke down so he called the victim for help. Within minutes of the victim’s arrival in his white Ford Thunderbird, the victim was shot twice in the face from one to three feet away.[2]
*429 As the victim lay on the ground, Petty, at Meredith’s instruction, drove away in the victim’s car. According to Turner, Meredith forced him to drive away and take him to a residential neighborhood in Marrero.
Around the same time, Curtis Webber was sitting in his car in his driveway on Avondale Garden Road when he saw a Lincoln Continental parked on Center Street, which is the street behind his house. Suspecting that the vehicle might be dumping trash, he backed out of the driveway, drove around to the vehicle, and confronted the driver of the vehicle. When the driver informed Webber that he was “waiting for a jump,” Webber returned to his driveway.
Almost immediately after he returned to his driveway, he observed a white vehicle pull nose-to-nose with the Lincoln. Web-ber saw a man exit that vehicle. Within a minute, Webber heard two gunshots. When he looked up, he saw both vehicles drive away. After consulting with his wife, Webber dialed 911 and reported the shooting. A recording of that call was played for the jury.
When JPSO responded, officers found the victim’s body. Detective Beavers of the Jefferson Parish Sheriffs Office (“JPSO”) discovered the victim’s cellular telephone at the scene and notified the victim’s parents of his death.[3]
That afternoon, a neighbor informed the victim’s father, Cletis Jessie, Sr. (hereinafter “Jessie, Sr.”), that his son’s car was parked in the woods off of Sauvage Road. Jessie, Sr. notified Detective Beavers of the car’s location. That |4evening, JPSO personnel recovered the victim’s vehicle, a white Thunderbird, in the location they had been directed to, a wooded area in the rear of Orleans Village subdivision.
Detective Beavers of JPSO testified that stolen vehicles were often stripped and discarded in that area, and it appeared that thieves had attempted to “strip the victim’s vehicle.” The windows were down, one of the doors was open, most of the wheels’ lug nuts were removed, and other items from the vehicle were strewn on the ground around the car. The wheels’ rims were damaged, which demonstrated a significant effort to remove the rims and tires. The thieves were unable to remove the rims and tires because they could not locate the special key needed to remove the last lug nut from each wheel. Likewise, there was a wire hanging from the audio equipment in the trunk indicating an unsuccessful effort to remove that equipment. A cloth glove was recovered from the ground next to the car.[4] The murder weapon was never recovered.
At trial, defendant testified on his own behalf. He stated that the victim was his best friend and he knew the Jessie family well. On the day of the incident, defen *430 dant was on his way to pick up money from his mother’s house on Senate Street, when he stopped off to see his friend that lived on Center Street. While on his way to his friend, defendant encountered Meredith and Petty, who asked for a ride to Deacon Street. Defendant agreed and continued on to Center Street, where his car broke down and he called the victim for assistance. During the drive, defendant noticed that Meredith had a gun in his possession.
Once the victim arrived in his white Thunderbird, defendant immediately began attaching the jumper cables to the car batteries, and the victim asked him to | ¡¡assist with a loose wire on his amplifier and to adjust the sound on either the bass or high knob, which required two people. At that point, defendant’s car started and Meredith exited the vehicle and began speaking with the victim.
While the defendant was removing the jumper cables from the vehicles, the conversation got louder and defendant heard the victim call for his help. Defendant looked up and saw Meredith pointing a gun at the victim. Defendant told Meredith to “chill out” three times, then Meredith shot the victim.
Next, Petty entered the victim’s vehicle and Meredith entered the defendant’s vehicle and forced him to drive him to Lin-colnshire, threatening his family along the way. Defendant testified that the victim’s car had custom rims that required a lug nut key for removal; however, he could have removed the rims because he knew the key was located in the glove compartment. Later, defendant called the victim because he wanted to make sure he was alive, but he did not call the police because he was afraid.
The day after the shooting, defendant also called John Ray, Meredith’s brother, on a landline phone, who instructed him not to say anything. Defendant changed his alternator that night to make sure he did not break down again after what he had experienced; however, his car broke down again because the problem was the battery. Defendant agreed that while he was changing his alternator, the victim was lying dead on Center Street, and although he called, he never returned to the scene to check on the victim, his best friend.
On cross-examination, defendant admitted that Meredith had a reputation for shooting people, yet he still gave him a ride because it was his friend’s younger brother. He also allowed him to stay in the vehicle after he brandished a gun. Defendant stated that he made 17 phone calls to Meredith’s brother just after the murder, but never spoke to Meredith. Defendant also stated that he believed the | ¿victim had a pair of gloves like the one found near the victim’s vehicle, but they were not his gloves. Defendant declared that he would wear gloves to help the victim change his tires so it would be possible that his DNA was on the gloves if they were the victim’s gloves.
After hearing the testimony and evidence, the twelve-person jury unanimously found defendant guilty as charged of conspiracy to commit armed robbery and second degree murder. This appeal follows.

Law and analysis

On appeal, defendant raises three assignments of error: first, there was insufficient evidence to support Jeremy Turner’s convictions for second degree murder, and conspiracy to commit armed robbery; second, the trial court erred in removing a prospective juror, over the objection of defense counsel, without making a proper inquiry into whether he should have been disqualified from serving, which violated Mr. Turner’s right to a fair trial under the Fifth and Four *431 teenth Amendments to the United States Constitution; and, third, the trial court erred in allowing co-defendant Roddrick Petty to invoke his Fifth Amendment privilege in the presence of the jury, which violated Mr. Turner’s right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution.
In his first assignment of error, defendant argues that there was insufficient evidence presented at trial to support defendant’s convictions for second degree murder and conspiracy to commit an armed robbery. In particular, the defendant argues that the State failed to negate the reasonable hypothesis that defendant called the victim only because he needed help starting his car, and that he had no knowledge that his companions would commit an armed robbery or shoot the victim.
|7The constitutional standard for testing the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, a review of the record of a criminal conviction for sufficiency of evidence does not reqüire the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id.
“Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. However, this requirement does not establish a standard that is separate from the Jackson standard, but instead provides a helpful methodology for determining the existence of reasonable doubt. State v. Lathers, 03-941 (La.App. 5 Cir. 2/23/04), 868 So.2d 881, 884. To support the conclusion that the defendant is guilty beyond a reasonable doubt, all evidence, both direct and circumstantial, must be sufficient. Id. (citation omitted).
When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier-of-fact, is sufficient to convict. State v. Addison, 00-1730, p. 4 (La.App. 5 Cir. 5/16/01), 788 So.2d 608, 613, writ denied, 01-1660 (La.4/26/02), 814 So.2d 549. Further, it is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence absent impingement- on the fundamental due process of law. Bailey, supra.

Conspiracy to Commit Armed Robbery

Armed robbery, La. R.S. 14:64, is the taking of anything of value belonging to another from the person of another or *432 that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:24 defines a principal as one concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.
The elements of the crime of conspiracy, La. R.S. 14:26, are (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, and (2) an act done in furtherance of the object of the agreement or combination. The first element of conspiracy requires specific intent, which is defined in La. R.S. 14:10, as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Intent may be inferred from the circumstances of the transaction and the actions of the defendant.
The second element of conspiracy is an overt act, which need not be unlawful. It may be any act, innocent or illegal, accompanying or following the | nagreement, which is done in furtherance of its object. State v. Jackson, 00-221 (La.App. 5 Cir. 3/15/01), 783 So.2d 482, 487, writs denied, 01-1071 (La.5/9/03), 843 So.2d 385, and 01-1258 (La.5/9/03), 843 So.2d 386. Proof of conspiracy may be made by circumstantial evidence. Id.
At trial, Sergeant Klein confirmed phone calls between defendant’s phone and a phone associated with Meredith just before the murder, on the day of the murder, and just after the murder. Klein testified that he confirmed phone calls between the defendant and the victim’s cell phone at 5:00 a.m. on the morning after the murder.
Detective Beavers testified that the victim’s car, which thieves attempted to strip, was recovered ten and a half miles away from the site where the body was recovered. The car was found off of Sauvage Road, where stolen vehicles are often stripped and discarded. DNA retrieved from the cloth glove recovered near the victim’s car was corresponded to DNA from defendant and two other sources.
Jessie, Sr. testified that when the defendant arrived at his home on the afternoon after the murder, he held his head down avoiding eye contact and told Jessie, Sr. that he witnessed the victim’s murder, and “he didn’t want what happened to [the victim] on him.” Jessie, Sr. subsequently received a phone call from defendant where he stated that he wanted to talk to the detectives in the case and he would tell them everything he knew about the events that took place. Defendant then told Jessie, Sr. that “they was [sic] not supposed to kill him, they was just supposed to rob him. Jessie, Sr. asked why he left his brother on the ground and the defendant became silent and repeatedly apologized.
Conversely, defendant denied any involvement in either the armed robbery or the victim’s murder. When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who 110may accept or reject, in whole or in part, the testimony of any witness. Bailey, supra. It is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence absent impingement on the fundamental due process of law. Id.
Considering the foregoing, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State produced sufficient evidence at trial to prove the essential elements of conspiracy to commit armed robbery beyond a reasonable doubt, i.e., that defendant intentionally lured de *433 fendant to Center Street so that Meredith and Petty could rob defendant at gunpoint. Second Degree Murder
Second degree murder, La. R.S. 14:30.1(A), is the killing of a human being when the offender (1) has specific intent to kill or to inflict great bodily harm or (2) is engaged in the perpetration or attempted perpetration of armed robbery (and other listed felonies) even though he has no intent to kill or to inflict great bodily harm.
Defendant argues that the State failed to negate the reasonable hypothesis that he called the victim only for a jump and had no knowledge that his companions would commit an armed robbery and shoot the victim. Defendant’s testimony at trial indicated that he was merely an innocent bystander. Defendant denied planning to rob or kill the victim and stated that Jessie, Sr. lied when he testified that defendant told him that they were only supposed to rob the victim. He also indicated that Webber’s timeline was incorrect.
At trial, Jessie, Sr. testified that the defendant told him that they were only supposed to rob his son, not kill him, suggesting that defendant knew that his “associates” were going to commit an armed robbery. Further, he testified that the | nvictim was shot to accomplish the armed robbery. Curtis Webber saw a Lincoln Continental parked on Center Street, which is the street behind his house. When he confronted the driver of the vehicle, the driver informed Webber that he was “waiting for a jump” and Webber returned home. Almost immediately after he returned home, Webber observed a white vehicle pull nose-to-nose with the Lincoln. Webber saw a man exit that vehicle. Within a minute, Webber heard two gunshots. When he looked up, he saw both vehicles drive away.
The jury, when confronted with conflicting testimony, rejected the defendant’s testimony and accepted Jessie, Sr. and Webber’s testimony, which is its sole determination. Bailey, supra. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. Id.
Considering the foregoing, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State produced sufficient evidence at trial to prove the essential elements of second degree murder beyond a reasonable doubt, i.e., that defendant was a principal to a homicide committed during an armed robbery. This assignment of error lacks merit.
In his second assignment of error, defendant argues that the trial court erred in removing a prospective juror, over the objection of defense counsel, without making a proper inquiry into whether he should have been disqualified from serving, which violated Mr. Turner’s right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, defendant contends that the trial court erred in removing prospective juror Bertrand Sparks over his objection. Defendant argues that the trial court did not properly inquire as to whether Sparks should have been disqualified.
112The erroneous allowance to the State of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the State of more peremptory challenges than it is entitled to by law. La.C.Cr.P. art. 800(B). Because the minutes reflect that the State used all of its peremptory challenges, defendant may have grounds for complaint.
In the instant case, Bertrand Sparks was called in the last panel of prospective jurors. When the court asked defendant if *434 he had any prior jury experience, the following exchange took place.
THE COURT: Have you had prior jury experiences?
MR. SPARKS: On a drive by in the Harvey Tunnel when they had drive by shooting in the Harvey Tunnel.
THE COURT: Were you accepted to serve as a juror in that case?
MR. SPARKS: I was only one time, but they had, I had a nephew shot up in Algiers in '98. On that drive by in the Harvey Tunnel when they had that, it be back in the 80’s when they had two of them, in the drive by in the Harvey Tunnel.
THE COURT: Okay, did y’all reach a verdict in that case?
MR. SPARKS: They did, but they dismissed me.
THE COURT: All right, have you ever been the victim of a crime?
MR. SPARKS: No, I ain’t never been victim of a crime.
THE COURT: Okay, a victim of a crime?
MR. SPARKS: Uh-uh, no, I had tickets but I never been convicted of a crime.
THE COURT: Okay, do you have any connection with law enforcement?
MR. SPARKS: I have tickets, that’s about it, you know and one time, you know, one time I had, I was driving.
11sLater, the State questioned the jurors’ understanding of the law using a hypothetical situation involving two individuals that conspired to commit armed robbery of a bank: one person robbed the bank and killed the security guard while the other was the getaway driver, who did not intend for the security guard to be killed. The State then explained that the driver was still guilty of second degree murder and asked if that made sense to everyone. Mr. Sparks responded: “He had something to do with it, he knows what was done.”
Finally, the State asked the jurors to rate the Jefferson Parish Sheriffs Office on a scale from 1 to 10 based on their personal experience or opinion. Sparks responded: “My determination, we ain’t dealing Jefferson Sheriff, we dealing with Jeremy Turner, so I don’t have nothing about the Jefferson Parish. What you talking about ain’t being funny it ain’t got nothing to do with the police department.” Sparks further stated that he had nothing more to say about the police department and added that “they got a job to do.” The record does not reflect that Sparks made any comments or was otherwise questioned during the defense’s voir dire examination of the panel.
At a bench conference, when the State and defense had finished exercising challenges for cause, the following exchange took place.
THE COURT: Okay, I want you both to help me with something.
MR. FREESE: I’m sorry, with respect to No. 496, Mr. Sparks.
THE COURT: Thank you, that’s what I was about to ask. Could you understand what he was saying?
MR. FREESE: Only about 50 percent of it. The question is whether or not he can adequately communicate with other jurors.
THE COURT: That’s precisely the point, that’s my concern. You have anything to say about him?
MR. DUFFY: No, I don’t.
|UTHE COURT: He’s gone.
MR. DUFFY: Note my objection for the record.
THE COURT: Then let me be clear. The reason I’m going to grant that challenge for cause is No. 1, I’m not sure that Mr. Sparks, during my voir *435 dire or yours, either one of you, understood the questions. More importantly, I’m not so sure that his remarks [sic] his ability to communicate with fellow jurors if he’s seated on the panel. Those two combined form the basis of my granting the challenge for cause.
MR. FREESE: And since this is a written record that will go up and not an audible record, I would offer the observation that whether it be because of the disability that he alluded to and questioned by the Court or for some other reason he has a tremendous difficulty enunciating in a fashion that allows the listener to understand what he says. You know, my own perception was I picked up about 50 percent of what his words were, spoken words were.
THE COURT: Mr. Duffy, do you disagree with those perceptions?
MR. DUFFY: No, but I disagree with the assessment that he wouldn’t be able to communicate with fellow jurors should he be chosen for the jury.
La.C.Cr.P. art. 797 allows either the defendant or the State to challenge a juror for cause on the ground that he lacks a qualification required by law, or that he is not impartial. La.C.Cr.P. art. 401(A)(3) and (4) state that jurors must be free of mental or physical incapacity and be able to read, write, and speak English. A person may be challenged for cause due to a loss of hearing or the existence of any other incapacity which satisfies the court that the challenged person is incapable of performing the duties of a juror in the particular action without prejudice to the substantial rights of the challenging party. La.C.Cr.P. art. 401(B)(1).
The question of a juror’s qualifications is addressed to the sound discretion of the trial judge. State v. Mitchell, 08-186 (La.App. 5 Cir. 1/13/09), 7 So.3d 720, 734. A trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror. State v. Michel, 07-47 (La.App. 5 Cir. 5/29/07), 961 So.2d 516, 522, writ denied, 07-1422 (La.1/7/08), 973 So.2d 732. The trial court “has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning,” whereas the reviewing court reviews the matter only on a transcript in a record. State v. Anthony, 98-406 (La.4/11/00), 776 So.2d 376, 392, cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000). Thus, a trial judge’s ruling on a challenge for cause will not be disturbed on appeal unless a review of the voir dire as a whole indicates an abuse of discretion. State v. Michel, supra.
Our review of the entire voir dire does not reveal that the trial court abused its discretion in granting the State’s challenge for cause regarding prospective juror Sparks. Here, the trial court had to ask Mr. Sparks three times about his prior participation in a jury before the Court was able to elicit a response. In addition, the trial court twice had to ask Sparks whether he was a victim of a crime. In response, Sparks answered that he had never been convicted of a crime.
Further, the defense neither questioned Sparks during voir dire nor argued against the State’s challenge for cause. In fact, defense counsel agreed with the observations of the trial judge and the prosecutor that Sparks had difficulty understanding the questions asked of him and tremendous difficulty enunciating so that the listener could understand him, i.e., only about 50 percent of his words were perceivable.
*436 Because the record supports. the trial court’s conclusion that Sparks had a mental or physical infirmity, which rendered him incapable of performing his |1fiduties as a juror, we find that the trial court did not abuse its .discretion in disqualifying Sparks. Based on the foregoing, this assignment of error lacks merit.
In his third assignment of error, defendant argues that the trial court erred in allowing co-defendant Roddrick Petty to invoke his Fifth Amendment privilege in the presence of the jury, which resulted in a violation of Mr. Turner’s right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, defendant argues that the trial court erred in allowing the State to call co-defendant Roddrick Petty as a witness before the jury when the State knew he would invoke his Fifth Amendment privilege against self-incrimination. Defendant contends that Petty’s assertion of privilege in the presence of the jury prejudiced his case and violated his right to a fair trial.
The State first argues, as a procedural matter, that defense counsel did not make the required contemporaneous objection to the trial court’s ruling allowing Petty to take the stand. On the merits, the State argues there was no error in calling Petty to the stand, because he had no Fifth Amendment privilege to assert. Moreover, the State argues, that defendant was not prejudiced in any way.
During a bench conference, the judge discussed the State’s motion to compel Petty to testify with prosecution and defense counsel after requiring Petty’s attorney, Joseph Perez, to be present. While Perez strenuously objected to the State’s motion to compel as unconstitutional, defense counsel waived defendant’s presence stating that he assumed the hearing did not involve him or the defendant. After hearing arguments from the State and Perez, the trial court granted the State’s motion to compel Petty to testify.
The contemporaneous objection rule provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” La.C.Cr.P. art. 841. The purpose behind the contemporaneous 117objection rule is to put the trial judge on notice of an alleged irregularity, allowing him the opportunity to make the proper ruling and correct any claimed prejudice to the defendant. This prevents the defendant from gambling for a favorable verdict at trial and then later utilizing appellate review to correct errors that might easily have been corrected by the trial judge. State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1100, unit denied, 05-0081 (La.4/22/05), 899 So.2d 559. The Louisiana Supreme Court has said, “There are no formal requirements detailing any specific form for an objection. All that is required is that a party make clear, at the time an order of the court is made or sought, the action which he desires the court to take, together with an objection and grounds.” State v. George, 95-0110 (La.10/16/95), 661 So.2d 975, 981.
Here, the record reveals that the defense did not object to the trial court’s ruling as he did not believe it pertained to his client. Cf. State v. Laviolette, 06-92, p. 13 (La.App. 5 Cir. 9/26/06), 943 So.2d 527, 535, writ denied, 06-2585 (La.5/18/07), 957 So.2d 149. Based on the foregoing, we find that this assignment of error was not properly preserved for appellate review for failure to make a contemporaneous objection with specificity at trial.

Errors patent

Here, the defendant requests an error patent review, which this Court routinely performs in accordance with La.C.Cr.P. *437 art. 920. Our review reveals no errors that require correction.

AFFIRMED

. Defendant was indicted along with Danari-us R. Meredith and Roddrick A. Petty. The State severed the trials of the defendants on February 23, 2011.

. Dr. Susan Garcia, an expert in forensic pa *429 thology, performed the victim's autopsy for the Jefferson Parish Sheriff’s Office at the Jefferson Parish Forensic Center. Dr. Garcia ruled that the manner of the victim's death was homicide and his cause of death was two gunshot wounds, one to each cheek, which caused lethal injury to critical portions of the victim’s brain. Based on the stippling and faint areas of smoke on the victim’s face, Garcia was able to determine that the weapon was discharged in between one and three feet from the victim.

. The victim was the only child of Ann Marie Jessie, Sr. and Cletis Jessie, Sr.

. Adriana Perez, an expert in forensic DNA analysis, testified that the cloth glove found next to the victim's vehicle revealed a mixture of DNA from at least three individuals, including Jeremy Turner. Perez also determined that DNA obtained from the steering wheel of the victim’s 1996 Ford Thunderbird was consistent with a mixture of DNA from at least three individuals, including the victim, Meredith, and Petty.