MARION F. EDWARDS, Judge.
 

 12Defendant/appellant, Trenton Tatum (“Tatum”), appeals both his conviction of conspiracy to obstruct justice, as well as his sentence.
 

 On October 28, 2008, the Jefferson Parish District Attorney filed a bill of information charging Tatum with the attempted second degree murder of Marvin Newman (“Newman”), in violation of La. R.S. 14:27 and La. R.S.14:30.1. On May 11, 2009, the State filed an amended bill of information charging Tatum with two offenses. In Count 1, Tatum was charged with attempted second degree murder of Newman, and, in Count 2, with conspiracy to obstruct justice, in violation of La. R.S. 14:26 and La. R.S. 14:130.1. Denzel Fields (“Fields”) was charged as a co-defendant as to Count 2 only. Ultimately, the State dismissed Count 2 of the bill of information as to Fields only.
 

 Tatum was tried by a twelve-person jury as to both counts of the amended bill. The jury was unable to reach a verdict as to Count 1, and the trial court declared a mistrial as to that count. That charge was later dismissed. However, the jury found Tatum guilty as charged as to Count 2. He was sentenced to ten years at hard labor.
 

 |sThe relevant testimony at trial is as follows:
 

 Candice Cobena (“Ms. Cobena”) testified at trial that in September 2008, she was seventeen years old and was a student at John Ehret High School (“John Ehret”). She knew Tatum, also a student at John Ehret. Ms. Cobena testified that their first meeting resulted in a verbal altercation because she thought Tatum called her
 
 *1085
 
 “the B word.” After that incident, Tatum and Ms. Cobena argued nearly every day at school. They shouted and cursed at each other.
 

 Newman, Ms. Cobena’s boyfriend at that time, did not attend John Ehret. Newman and Tatum became involved in an argument one day when Newman picked Ms. Cobena up from school. Tatum was driving a white Monte Carlo. On the evening of September 5, 2008, Ms. Cobena was standing in front of her house at 2868 Victoria Drive, talking with Newman. Her mother and her brother, Corey, were also there. A white Monte Carlo rode past the house. Ms. Cobena testified that, at first, she did not notice the car, but Newman did. The Monte Carlo approached the house a second time and then stopped. The driver’s side of the car faced Ms. Cobena and Newman. According to Ms. Cobena, Fields was driving the car, and Tatum was on the front passenger side, sitting on top of the door. There were three people in the back seat, but Ms. Cobena could not identify them.
 

 Ms. Cobena testified that Newman approached the Monte Carlo and asked Tatum, “What you were saying?” Newman turned away from the car and started to run, at which time Tatum fired a black gun at him, hitting Newman in his left side. Corey Cobena drove him to a hospital, and Ms. Cobena telephoned 9-1-1.
 

 Ms. Cobena testified that she identified Tatum as the shooter in a photographic lineup and told the detectives that Fields was the driver of the car.
 

 | ¿Newman testified that he knew Ms. Cobena was having trouble with Tatum, who was cursing her out at school. He had a brief confrontation with Tatum outside of John Ehret. On that day, Tatum was driving a white Monte Carlo.
 

 On the night of the shooting, Newman was standing outside with Ms. Cobena when he saw the white Monte Carlo pass once without stopping. When the car returned, Tatum was sitting on the passenger door with a gun resting on the roof. Newman approached the Monte Carlo in an attempt to get a better look at its occupants, and Tatum fired six shots at him, hitting him in his side.
 

 Fields testified that he had entered into an arrangement with the State by which he agreed to testify for the State at Tatum’s trial in exchange for the dismissal of the charges against him.
 

 Fields testified he was eighteen years old at the time of trial. He considered Tatum to be his best friend. Fields stated he knew Ms. Cobena from school, and he knew who Newman was. He was aware that there were problems between Tatum and Ms. Cobena and was present during the confrontation between Tatum and Newman at John Ehret.
 

 Fields testified he knows of the shooting that took place in front of Ms. Cobena’s house on September 5, 2008, but he was at home when it occurred. He first learned about the shooting when a schoolmate named Mariah telephoned him with the news. Upon learning of the shooting, Fields telephoned Tatum. Tatum asked him to go to his house, which was a five-minute walk from Fields’ residence.
 

 Fields testified that, when he arrived at Tatum’s house, Tatum was in the kitchen, and there was a black, .40 caliber gun on the kitchen table. Fields had seen the gun before. Fields asked Tatum what he planned to do with the gun, and Tatum said he did not know. Fields asked Tatum if he wanted him to hold the gun |sfor him, and Tatum said he did, handing the gun to Fields along with a red rag that held bullets. Fields took the items and returned to his house. He unscrewed the stereo at
 
 *1086
 
 his residence and hid the gun and the bullets inside of it. Tatum telephoned him later that night and asked him if he had taken care of the gun, and whether the gun was “cleaned.” ' Police officers arrived at Fields’ house that night and interviewed him. They repeatedly asked him where the gun was. Finally, he showed them where he had hidden the gun. Fields was arrested and brought to the Detective Bureau, where he submitted to interviews. At trial, he testified that he was mistaken as to some of the answers he gave during those interviews because he was nervous.
 

 According to Fields, Ms. Cobena’s claim that he was the person driving the Monte Carlo at the time of the shooting was incorrect. He was not in the car at the time of the shooting.
 

 Ayonna Jones (“Ayonna”) testified she is seventeen years old. She knows Tatum and Ms. Cobena is a friend of hers. Ayon-na testified she was sitting in the back seat of the white Monte Carlo at the time of the shooting. Shatyra Carbo (“Shatyra”), Edward Hester (“Hester”), Tatum, and a little boy were also in the car, but Fields was not.
 

 The group went first to Ms. Cobena’s home so that Ayonna could pick up some compact discs Ms. Cobena had borrowed from her. Tatum was driving the car at that time, and Hester was sitting in the front passenger seat. When they arrived in front of Ms. Cobena’s house, she saw Ms. Cobena; Ms. Cobena’s mother; Ms. Cobena’s brother, Corey; and Newman outside. When Tatum saw the group, he became angry. He drove past the house, then turned and drove back to Ms. Cobe-na’s house. Tatum reached for something in the compartment between the front seats. Ayonna put her head down and began crying. She did not see ^anything else, but she heard five or six gunshots. Tatum then drove the group to his house in the Woodmere Subdivision. Ayonna went into the bathroom and stayed there. She did not recall seeing Fields at Tatum’s house.
 

 Candice Gaines (“Gaines”) testified that, prior to the shooting, in August of 2008, Tatum visited her. Gaines invited him into her house. In the conversation, she told him her stepfather was a police officer. Tatum asked Gaines whether there were any guns in the house, and she led him to her parents’ bedroom closet, showing him some guns that were stored in cases. Gaines testified that Tatum wanted to take one of the guns with him. She stated that she and Tatum argued over it and, ultimately, he ran away with it. He never returned the weapon. It was later discovered he took two guns. Gaines identified Tatum in a photographic lineup as the person who took her father’s guns.
 

 Brett Casimir (“Mr. Casimir”), Gaines’ stepfather, testified that he is a Jefferson Parish sheriffs deputy. He discovered two of his personal handguns had been stolen from his Gretna home. One was a Glock .40 caliber model 22 and one of the magazines was missing. The other gun was a .38 caliber Smith & Wesson Airway revolver.
 

 Mr. Casimir reported the theft to police, eventually learning that his guns were recovered from Tatum. Mr. Casimir identified State’s Exhibit 42 as the revolver that was taken from his home and State’s Exhibit 70 as his Glock .40 caliber handgun. He identified State’s Exhibit 2 as a shell casing consistent with the ammunition used in the Glock.
 

 Detective William Jones (“Detective Jones”) testified that he was the lead investigator assigned to the September 5, 2008 shooting. He supervised the recovery of evidence from the scene. Among the items recovered were eleven spent bullet
 
 *1087
 
 casings. Through his investigation, Detective Jones learned there were |7two possible suspects named Tatum and Fields. He obtained an arrest warrant for Tatum and a search warrant for his residence. Detective Jones and other officers executed the search warrant at 1:41 a.m. There was a white Monte Carlo in the driveway of the home. The officers knocked on the front door, and Tatum’s father, Barnell Tatum, Sr., answered.
 

 Detective Jones testified that he recovered a .38 caliber revolver in an upstairs bedroom that was occupied by Tatum when the officers arrived at the residence. He identified State’s Exhibits 42 and 43 as the revolver and the cartridges found inside it. Detective Jones said the revolver was not the gun used in the shooting; that gun was recovered from Fields’ house by Detective Roger Gorumba (“Detective Go-rumba”).
 

 Detective Jones testified that Tatum was arrested for attempted second degree murder on the night of the shooting. Detective Jones questioned Tatum at the Criminal Investigations Bureau after advising him of his rights. At that time, Tatum admitted to the shooting.
 

 Detective Jones conducted two tape recorded interviews with Tatum, both of which were played for the jury. The recordings were transcribed, and the transcripts were admitted into evidence.
 

 In the first interview, Detective Jones asked Tatum to tell him what happened, and he responded, “I went to drop somebody off, uhm, saw them outside, we start shooting.” Tatum stated that “Edward,” whose last name he did not know, was driving the car and he was sitting in the front passenger seat. Tatum said that, when they arrived at the scene of the shooting, Newman said to him “what’s up” and “let’s go,” indicating he was ready to “go at it.” Tatum wanted to fight the victim and had had verbal altercations with Newman’s girlfriend at school. Ms. Cobe-na had told him “we gonna shoot” the Monte Carlo.
 

 IsAfter he and Newman exchanged words, he (Tatum) started shooting. The gun he used was a “forty.” The driver’s side of the Monte Carlo was facing the house, and he shot the victim while sitting on the car’s window and firing over the top of the car. He was not aware that he had hit Newman.
 

 Tatum told Detective Jones that, after the shooting, he gave the gun to his friend, Fields. Fields went to Tatum’s house to get it. Fields was not with him at the time of the shooting. He did not tell Fields what had happened; he told him to hold the gun. The transcript of Tatum’s second recorded statement reflects that he identified Hester as the person who was driving the Monte Carlo at the time of the shooting. Tatum told Detective Jones that Hester knew he had a gun in the car, but Hester did not know he was going to shoot Newman. Tatum denied knowing where the gun found in his room came from.
 

 The detective conducted a tape-recorded interview with Fields. When questioned, Fields denied he was the driver of the Monte Carlo. Detective Jones eventually arrested Fields when it became apparent that he had conspired to obstruct justice by hiding the gun used in the shooting.
 

 Detective Gorumba testified that he and several other officers conducted a consent search of Fields’ residence at 2489 Lynn-brook Drive in Harvey in the early morning hours of September 6, 2008. Fields told the officers where the .40 caliber gun was hidden. The officers recovered a .40 caliber Glock semi-automatic handgun and twenty rounds of ammunition that were hidden inside a stereo in the residence. The ammunition was wrapped in a red rag.
 

 
 *1088
 
 Meredith Acosta (“Ms. Acosta”), a firearms examiner with the Jefferson Parish Sheriffs Office Crime Lab, was accepted by the trial court as an expert in the field of firearms identification. She testified that she examined State’s Exhibit 70, a .40 caliber Glock model 22 semi-automatic pistol. She also examined State’s [9Exhibit 2, consisting of eleven fired .40 caliber cartridge cases recovered from the 2800 block of Victoria Drive in Marrero. Ms. Acosta determined that the casings were ejected from the Glock.
 

 Barnell Tatum, Sr. (“Mr. Tatum”), Tatum’s father, testified for the defense at trial. He stated he was awakened in the early morning hours of September 6, 2008 when Jefferson Parish deputies knocked on the door of his residence. The officers told him they had a warrant to arrest his son for murder. The officers asked Mr. Tatum where his son was, and he directed them upstairs. The deputies escorted Tatum downstairs in handcuffs. Mr. Tatum asked if he could speak with his son, who was only seventeen years old. The officers told him he could not. Barnell allowed the officers to search his house and the Monte Carlo. The officers told him they found a gun in his house, but he did not see a gun in his house.
 

 Tatum testified that he went to Gaines’ house in August 2008, and she showed him some guns. He asked her if he could take the .40 caliber and .38 caliber weapons, and she told him he could. He never intended to return the guns to Gaines. Tatum testified he sold the .40 caliber gun to Fields and kept the .38 caliber weapon. He has known Fields for ten years, and they were friends.
 

 On the evening of the shooting, Tatum drove his mother to work in the Monte Carlo. In the car with them were his nephew, his baby sister, and Hester. After taking his mother to work,. Tatum drove his sister to his grandmother’s house. By that time it was about 8:00 p.m.
 

 Tatum picked up Fields at about 8:20 p.m. Then he picked up Ayonna and Sha-tyra at Ayonna’s house. They planned to pick up Ayonna’s CDs and then they would get pizza. Tatum stated that he drove the Monte Carlo the whole evening. Fields was riding in the front passenger seat, and Hester, Ayonna, Shatyra, and |inTatum’s nephew were in the back seat. Tatum did not know Fields had a gun with him.
 

 Ayonna directed him to the house where she was to pick up her CDs. They stopped in front of the house. Ms. Corbena and Newman were there. Fields said something to Newman and then sat on the window ledge of the vehicle and started shooting.
 

 Tatum testified that he sped off and drove directly to his house. Fields got out of the car and ran to his house nearby. The others in the car went with Tatum. Shortly thereafter, the group got into the Tatum family truck and went to the home of a friend, “Wade,” and Tatum told Wade about the shooting.
 

 Tatum testified that he did not call police about the shooting because he wanted to protect Fields. Police officers came to his house, took him outside, and stood him against a car. Detective Jones threatened him, and he was frightened. The detective also threatened him at the Detective Bureau. He told Tatum, “I know you did it,” and also said he would “put a charge on” his father.
 

 Tatum testified that he lied when he confessed to police that he was the shooter. He did so in order to protect Fields. He told police that Hester was driving the Monte Carlo in order to cover for Fields. In reality, Fields was the shooter. While Tatum agreed that he did have an alterca
 
 *1089
 
 tion with Ms. Cobena, he did not have a “beef’ with Newman.
 

 SUFFICIENCY OF EVIDENCE
 

 Count 2 of the amended bill of information alleged that, from August 4, 2008 and continuously thereafter until on or about September 10, 2008, Tatum knowingly and intentionally conspired, combined, and agreed with Fields to obstruct justice and tamper with evidence. The bill further alleged that, in furtherance of this conspiracy, Tatum did the following acts: 1) on or about | nSeptember 5, 2008, Tatum attempted to commit second degree murder of Newman; and 2) on or about September 5, 2008, Fields removed the weapon used by Tatum to commit the attempted second degree murder from Tatum’s custody to cover up said crime, with Tatum’s approval, all in violation of La. R.S. 14:26 and La. R.S. 14:130.1.
 

 The elements of the crime of conspiracy are: (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, plus (2) an act done in furtherance of the object of the agreement or combination. La. R.S.
 
 14:26.
 

 [1]
 

 La. R.S. 14:130.1(A), in pertinent part, states:
 

 A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
 

 (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
 

 (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; or
 

 (b) At the location of storage, transfer, or place of review of any such evidence.
 

 Tatum alleges that the evidence was insufficient to support his conviction for conspiracy to obstruct justice because there was no evidence to show the element of an “agreement” with Fields to engage in conduct with the “specific intent to obstruct justice,” that is, to conceal the weapon used in the shooting. He contends | l2that the evidence, if believed, showed only that Fields decided to take possession of the gun on his own initiative, without “combination or agreement.”
 

 The first element of conspiracy requires specific intent, which is defined by La. R.S. 14:10(1) as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.”
 
 [2]
 
 Intent may be inferred from the circumstances of the transaction and the actions of the defendant. The overt act required as the second element of conspiracy need not be an unlawful one.
 
 [3]
 
 It may be any act, innocent or illegal, accompanying or following the
 
 *1090
 
 agreement, which is done in furtherance of its object.
 
 [4]
 
 Proof of a conspiracy may be made by direct or circumstantial evidence.
 
 [5]
 

 The knowledge requirement in La. R.S. 14:130.1(A) is met if the perpetrator merely knows that an act “reasonably may” affect a criminal proceeding.
 
 [6]
 
 The statute does not require the criminal proceeding actually be affected, the perpetrator just must know and understand that the act reasonably may affect the proceeding.
 
 [7]
 
 Further, the criminal proceeding need not already be underway, it need only be a “potential,” “future” proceeding.
 
 [8]
 

 The second requirement relevant to this case is that the perpetrator tamper “with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding.” La. R.S. 14:130.1(A)(1). Again, the tampering does not actually have to distort the results of any criminal investigation, the perpetrator need only have the specific intent to distort the results.
 
 [9]
 

 11sWith respect to the statute’s requirement that the tampering be either by the intentional “alteration, movement, removal, or addition of any object or substance,” the
 
 Jones
 
 court noted that “nothing beyond ‘movement’ is required by the statute if accompanied by the requisite intent and knowledge.” Finally, the tampering must be done “at the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation” by law enforcement officers.
 
 [10]
 

 During his first recorded interview with Detective Jones, Tatum stated that he told Fields to hold the gun. Further, Fields testified that Tatum replied, “yeah” when asked if he wanted Fields to hold the gun. This evidence was sufficient to prove an agreement to conceal the weapon. As evidence of an overt act done in furtherance of the conspiracy, Fields testified that Tatum handed him the gun, along with several bullets that were wrapped in a red rag. At that time, Tatum certainly knew, and Fields believed, the gun had been used to shoot the victim. In giving the gun to Fields, Tatum tampered with the evidence by removing or having it removed from his premises.
 

 Fields testified that he took the gun and the bullets and hid them in the stereo in his house. Fields stated that later that night, he spoke with Tatum on the telephone, who asked him “whether it was taken care of or not,” and “if it was cleaned or not.” From that testimony, the jury could reasonably infer that Tatum committed these acts with the knowledge that his actions would affect the police investigation of the shooting.
 

 Finally, Tatum clearly had good reason to believe that his residence would be the subject of an investigation by law enforcement officers, inasmuch as even in his own version of events, he (Tatum) was present at the shooting. The jury |uobviously found the State’s witnesses more credible than Tatum, and the credibility of witnesses will not be reweighed on appeal.
 

 
 *1091
 
 Based on the evidence presented at trial, any rational trier of fact could have found the essential elements of the crime of conspiracy to obstruct justice beyond a reasonable doubt, sufficient to satisfy the constitutional requirements as explained in
 
 Jackson v. Virginia.
 

 [11]
 

 This assignment of error is without merit.
 

 EXCESSIVE SENTENCE
 

 Tatum argues that his ten-year sentence, which was the maximum penalty, was constitutionally excessive, considering he was a first offender. He further contends the trial court erred in failing to take cognizance of the sentencing criteria set forth in La.C.Cr.P. art. 894.1.
 

 Tatum filed a motion to reconsider sentence, which was denied by the trial court. In his motion, he claimed only constitutional excessiveness. He did not include an argument regarding the sentencing guidelines in Article 894.1. Therefore, our review is limited to a review of the sentence for constitutional excessiveness only.
 

 A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.
 
 [12]
 
 Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender.
 
 [13]
 

 Three factors to be considered in reviewing a sentence for excessiveness are: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentences imposed for similar crimes by the same court and other courts.
 
 [14]
 
 When an |1BappeIlate court is reviewing a sentence, the relevant question is not whether another sentence might have been more appropriate, but whether the trial court abused its broad sentencing discretion.
 
 [15]
 

 According to La. R.S. 14:30.1(B), R.S. 14:27(D)(l)(a), R.S. 14:26, and R.S. 14:130.1(B)(2), Tatum’s maximum sentencing exposure was ten years, with a discretionary fine of $25,000.
 

 Tatum was apparently a first-time offender and was seventeen years old at the time of the offense. He argues that the trial court crafted a sentence designed to punish him for the non-verdict on the attempted murder charge.
 

 A trial judge may take into consideration criminal behavior that did not result in a conviction.
 
 [16]
 
 Here, the record reveals that Tatum stole two guns from a police officer’s home. He confessed to the shooting, although he denied it at trial. He was identified as the shooter by several witnesses. He conspired to hide the firearm used in the shooting. Medical testimony showed that the victim suffered serious, life-threatening injuries that may adversely affect him for the rest of his life. Under these circumstances, we do not find
 
 *1092
 
 an abuse of discretion in the imposition of the sentence. This assignment of error is without merit.
 

 EXCUSED JUROR
 

 Tatum complains that the trial court erred in excusing a juror, Beverly Winchester (“Ms. Winchester”), after trial testimony had begun. During the trial testimony of the State’s first witness, Detective Jones, Ms. Winchester notified the court that she has a cousin who lives on Victoria Drive, near the scene of the shooting, and that she is often in that neighborhood. While she did not recognize Tatum, she was concerned that he might recognize her. She was “a little scared” at |1fithat point. The judge explained to Ms. Winchester that it was important for the jurors not to bring any outside influences into the jury room, and if her concern would interfere with her ability to be fair and impartial, he would have to excuse her from the jury.
 

 When questioned by defense counsel, Ms. Winchester said she visited her cousin on Victoria Drive often, and she was concerned that someone present in court for the trial might recognize her. The juror pointed out a woman in the courtroom whom she recognized and told the judge she was “uncomfortable.” When the judge asked Ms. Winchester whether the situation rose “to the level of maybe it’s going to influence your thinking, or your vote[,]” she replied, “It may.” Ms. Winchester said the fact that she was scared might influence her.
 

 She repeated that she was scared. Again, the judge asked Ms. Winchester if she felt so uncomfortable sitting on this case that it would influence her vote, and she stated, “I think it will.” Thereafter, the trial court excused her for cause, over defense counsel’s objection. The alternate juror took Ms. Winchester’s place. The judge explained to the remaining jurors that Ms. Winchester had been released from the jury because she had become aware that her cousin lived on the street where the charged offense had occurred and that she was concerned that she was too close to the case.
 

 Tatum urges on appeal that the “very attenuated connection” between the juror and the crime scene was not so significant so as to justify her excusal on the court’s own motion, over his objection, and during trial.
 

 The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that | t7jurors be fair and unbiased.
 
 [17]
 
 The Louisiana Supreme Court has said, “A challenge for cause should be granted, even if the juror declares an ability to remain impartial, when the juror’s responses reveal facts from which bias, prejudice, or [partiality] may be reasonably inferred.”
 
 [18]
 
 A juror’s disclosure during trial that the juror knows or is related to a witness or the victim is not sufficient to disqualify that juror, unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict.
 
 [19]
 
 The connection
 
 *1093
 
 must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict.
 
 [20]
 

 Under La.C.Cr.P. art. 789, alternate jurors shall replace jurors who become unable to perform or are disqualified from performing their duties. The trial court has discretion to utilize the service of an alternate juror, rather than to grant a mistrial, upon a proper finding that this is the best course of action.
 
 [21]
 
 In the present case, Ms. Winchester persistently stated that she would be influenced by the proximity of the crime scene to a place she often visited. The juror was thoroughly questioned by the court, the prosecutor, and defense counsel. She stated repeatedly that she was frightened to remain on the jury, knowing that she might be recognized by one of the witnesses or a spectator in the courtroom. She felt she could not be a fair and impartial juror. Under these circumstances, the court did not abuse its discretion in excusing Ms. Winchester. In any case, Tatum does not show that he was prejudiced by the trial court’s dismissal of Ms. Winchester, who was replaced by an alternate juror whom the defense agreed to during voir dire.
 

 This assignment of error is without merit.
 

 |1sWe have reviewed the record for errors patent, and find none that require correction. For the foregoing reasons, the conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 .
 
 See also, State v. Barton,
 
 02-163, p. 15 (La. App. 5 Cir. 9/30/03), 857 So.2d 1189,
 
 writ denied,
 
 03-3012 (La.2/20/04), 866 So.2d 817.
 

 [2]
 

 .
 
 State v. Jackson,
 
 00-221 (La.App. 5 Cir. 3/15/01), 783 So.2d 482,
 
 writs denied,
 
 01-1071 (La.5/9/03), 843 So.2d 385, and 01-1258 (La.5/9/03), 843 So.2d 386.
 

 [3]
 

 .Id.
 

 [4]
 

 .
 
 Jackson, supra (citing State v. Richards,
 
 426 So.2d 1314 (La. 1982)).
 

 [5]
 

 .
 
 Jackson, supra; State v. Barton, supra.
 

 [6]
 

 . State v. Jones,
 
 07-1052 (La.6/3/08), 983 So.2d 95, 101.
 

 [7]
 

 .Id.
 

 [8]
 

 .
 
 Id.
 

 [9]
 

 .
 
 Id.
 

 [10]
 

 .
 
 State v. Jones,
 
 983 So.2d at 102.
 

 [11]
 

 .
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
 

 [12]
 

 .
 
 State v. Crawford,
 
 05-494 (La.App. 5 Cir. 1/31/06), 922 So.2d 666.
 

 [13]
 

 .
 
 State v. Quebedeaux,
 
 424 So.2d 1009 (La. 1982);
 
 State v. Sullivan,
 
 02-35 (La.App. 5 Cir. 4/30/02), 817 So.2d 335.
 

 [14]
 

 .State v. Tracy,
 
 02-0227 (La.App. 5 Cir. 10/29/02), 831 So.2d 503,
 
 writ denied,
 
 02-2900 (La.4/4/03), 840 So.2d 1213.
 

 [15]
 

 .
 
 State v. Walker,
 
 00-3200 (La. 10/12/01), 799 So.2d 461, 462 (per curiam).
 

 [16]
 

 .
 
 See, State v. Anderson,
 
 02-273 (La.App. 5 Cir. 7/30/02), 824 So.2d 517, 522,
 
 writ denied,
 
 02-2519 (La.6/27/03), 847 So.2d 1254;
 
 State v. Alexander,
 
 04-1209 (La.App. 5 Cir. 5/31/05), 904 So.2d 855.
 

 [17]
 

 .
 
 State v. Williams,
 
 00-1134 (La.App. 5 Cir. 3/28/01), 783 So.2d 566 (citing
 
 State v. Shelton,
 
 377 So.2d 96 (La. 1979)).
 

 [18]
 

 .
 
 State v. Anthony,
 
 98-0406, p. 24 (La.App. 5 Cir. 4/11/00), 776 So.2d 376, 392,
 
 cert. denied,
 
 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000).
 

 [19]
 

 .State v. Stewart,
 
 08-1265 (La.App. 5 Cir. 5/26/09) 15 So.3d 276;
 
 State v. Holland,
 
 544 So.2d 461, 465 (La.App. 2 Cir. 1989),
 
 writ denied,
 
 567 So.2d 93 (La. 1990).
 

 [21]
 

 .
 
 State v. Fuller,
 
 454 So.2d 119 (La.1984).
 

 [20]
 

 .
 
 Id.