STATE OF LOUISIANA

VERSUS

GENE FRANKLIN, JR.

NO. 21-KA-531

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ST. JAMES, STATE OF LOUISIANA
NO. 75,63, DIVISION "C"
HONORABLE KATHERINE TESS STROMBERG, JUDGE PRESIDING


May 11, 2022


**ROBERT A. CHAISSON**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Robert A. Chaisson, and Stephen J. Windhorst


**AFFIRMED; REMANDED FOR CORRECTION OF ERROR PATENT**
    **RAC**
    **SJW**

**CONCURS WITH REASONS**
    **FHW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Ricky L. Babin
Lindsey D. Manda
Donald D. Candell

COUNSEL FOR DEFENDANT/APPELLANT,
GENE FRANKLIN, JR.
Bruce G. Whittaker

**CHAISSON, J.**

Defendant, Gene Franklin, Jr., appeals his conviction and sentence for second degree sexual battery. On appeal, defendant contends that the trial court erred in allowing him to represent himself at trial and in discharging a sworn juror during the taking of evidence. Having found no merit to defendant's arguments, we affirm defendant's conviction and sentence. However, we remand the matter for correction of an error patent as noted herein.

## PROCEDURAL HISTORY

On December 12, 2016, defendant was charged by bill of information with second degree sexual battery, in violation of La. R.S. 14:43.2. Defendant pled not guilty on January 23, 2017. On July 25, 2017, after the State amended the bill of information to reflect a charge of sexual battery, in violation of La. R.S. 14:43.1, defendant pled guilty with the understanding that no multiple bill would be filed and that the court would sentence him after consideration of a pre-sentence report. However, defendant subsequently filed a motion to withdraw his guilty plea alleging that his plea was not knowingly and voluntarily entered. After a hearing on December 21, 2017, the trial court allowed defendant to withdraw his guilty plea.

On September 25, 2018, defendant proceeded to trial before a six-person jury on the original charge of second degree sexual battery and was found guilty as charged on September 26, 2018. Following his conviction, defendant filed a motion for post-verdict judgment of acquittal and a motion for new trial, which were denied by the trial court.

Defendant was ultimately sentenced on June 24, 2019, to fifteen years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Thereafter, on August 15, 2019, the State filed a multiple offender bill of information alleging that defendant was a third-felony offender. On January 27,

2020, the court conducted a hearing on the multiple offender bill and, on March 2, 2020, signed a written judgment finding defendant to be a third-felony offender. On April 26, 2021, the trial court vacated defendant's original sentence and sentenced him to an enhanced sentence of thirty years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant now appeals.

## FACTS

At trial, the victim, J.T., testified about the events that transpired on October 29, 2016, at the trailer she shared with defendant, her boyfriend at the time.[1] According to J.T., the two were lying down in bed together, and defendant began asking her for sex. When she requested that he wait until he woke up for work, defendant laid on top of her and repeatedly said, "Kiss me, look me in my eye and tell me you love me." J.T. described that defendant then "went to playing with [her] bottom or whatever," which she explained as "rear end." According to J.T., she told defendant to stop several times and to wait until he got up for work. J.T. stated that after she pushed his hands away a couple of times, she felt a "force in [her] booty." She described, "When it was a force, the pain went to my heart and I jumped out the bed." When defendant asked what was wrong with her, J.T. replied that she did not know what was going on, that her heart was hurting, and that she asked defendant, "What you done [sic] to me?" J.T. explained that she looked down, saw blood, and "went into shock from there." J.T. ran to her children on the other side of the house, describing that blood clots were "falling everywhere." She then went to the bathroom and sat on the toilet; when she got up, she noticed that the toilet was covered in blood. She then walked towards the sofa, leaving a trail of blood.

---

[1] In an effort to protect the victims of sexual offenses, we will refer to the victim and her family members by their initials throughout this opinion. La. R.S. 46:1844(W)(3).

Deputy Ray Marzelli with the St. James Parish Sheriff's Office arrived on the scene in response to a call of a medical emergency. At trial, Deputy Marzelli testified that upon his arrival, he noticed "blood on the floor, and a trail of blood leading down the hall to the bathroom." The officer further described that he saw J.T. sitting in a chair, that she had blood on her legs, and that there was also a fairly large area of blood that had pooled beneath her. When Deputy Marzelli then asked J.T. if she was possibly having a miscarriage, she replied that she was not pregnant and that it was "coming from the rear end." During his testimony, Deputy Marzelli relayed that defendant was at the residence when he arrived and that defendant appeared angry that a deputy was there. Deputy Marzelli further stated that J.T. was very quiet, did not volunteer information to him, and did not say that defendant inflicted any bodily harm to her. According to the deputy, an ambulance arrived on the scene and transported J.T. to the hospital, accompanied by defendant. The hospital records, which were introduced at trial, revealed that J.T. suffered a large laceration from her vaginal area to her rectum, which required emergency surgery. J.T. acknowledged that she gave untruthful stories to hospital personnel about how the injuries occurred and did not tell them that defendant inflicted those injuries on her. J.T. claimed that she did not initially tell the truth about what happened because defendant was with her, and she was afraid of him but also loved and wanted to protect him.[2]

J.T. was ultimately released from the hospital and returned home with defendant. Several days later, J.T. contacted the sheriff's office and provided a recorded statement that was consistent with her trial testimony. Defendant was subsequently arrested for second degree sexual battery.

---

[2] At trial, J.T. testified about the circumstances of a previous incident in which defendant became violent with her when she refused to take a bath with him.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assigned error, defense counsel contends that the trial court erred in allowing defendant to represent himself at trial. He specifically asserts that while the record shows that defendant desired to represent himself and was advised of some of the disadvantages of self-representation, it fails to establish an objective basis for concluding that the waiver was knowing and intelligent.

The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution give a defendant the right to counsel as well as the right to defend himself. A defendant may represent himself only if he makes an unequivocal request to represent himself and knowingly and intelligently waives his right to counsel. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State v. Perry*, 17-567 (La. App. 5 Cir. 6/27/18), 250 So.3d 1180, 1191, *writ denied*, 18-1325 (La. 11/14/18), 256 So.3d 285.

In accepting a waiver of counsel, the trial court should advise the defendant of the nature of the charges, the penalty range for the charges, and the dangers and disadvantages of self-representation, such as the failure to recognize objections to inadmissible evidence and the inability to adhere to technical rules governing trials. *State v. Speaks*, 16-163 (La. App. 5 Cir. 12/7/16), 204 So.3d 1167, 1199, *writ denied*, 17-185 (La. 10/16/17), 228 So.3d 751. In addition, the court should inquire into the defendant's age, education, and mental condition and should determine according to the totality of circumstances whether the accused understands the significance of the waiver. *State v. Bruce*, 03-918 (La. App. 5 Cir. 12/30/03), 864 So.2d 854, 857.

Whether a defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined on a case-by-case basis, considering the facts and circumstances of each case. *State v. Leger*, 05-11 (La. 7/10/06), 936 So.2d 108, 147-48, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279,

167 L.Ed.2d 100 (2007). The trial court is given much discretion in determining whether the defendant's waiver was knowing and intelligent. An appellate court should not reverse the trial court ruling absent an abuse of its discretion. *State v. Perry*, 250 So.3d at 1191.

In the present case, the record reflects that the trial judge conducted a thorough colloquy with defendant before granting his unequivocal request to represent himself at trial. On September 26, 2018, subsequent to the selection of the jury and prior to opening statements, defendant clearly expressed his desire to represent himself and actually referenced the language of La. C.Cr.P. art. 511, which provides, in part: "The accused in every instance has the right to defend himself and to have the assistance of counsel." Immediately after this request, the trial court made clear to defendant that the trial was going forward that day, and further asked defendant if he understood that he was doing himself a disservice by going forward without counsel and the grave risk he was taking by representing himself. Defendant stated that he understood. After giving defendant the opportunity to speak to someone in the audience about his choice to represent himself, defendant was sworn in, and the trial judge engaged in a lengthy discussion with him regarding his decision.

During the *Faretta* hearing, the trial judge determined that defendant could read and write the English language and that he did not have any known illnesses, mental or otherwise, that would in any way affect his ability to make the decision to represent himself.[3] The judge also inquired as to his understanding of the law and legal proceedings of the trial court. Further, the judge inquired as to defendant's understanding that he would have to question all of the witnesses, give

---

[3] The transcript from the *Faretta* hearing indicates that the trial court failed to ask defendant about his age and education. However, it is noted that defendant previously pled guilty in this case in front of the same judge who ruled that defendant could represent himself. At the July 25, 2017 hearing on defendant's guilty plea, the trial judge ascertained that defendant was thirty-two years old, had his GED, and could read, write, and understand the English language.

opening and closing statements, and make objections. Defendant indicated that he understood. The trial judge advised defendant of the dangers and disadvantages of self-representation, and defendant indicated he understood them. The trial judge tried to discourage defendant from self-representation several times, but defendant consistently expressed that he wanted to represent himself.

Defendant was informed that by choosing to represent himself he would be giving up any assistance by counsel. However, the court had two attorneys from the public defender's office sit at the bench right behind defendant and encouraged him to use them as a resource. Following this exchange, and in light of defendant's clear and unequivocal statements that he wanted to represent himself, the trial court granted defendant's request to represent himself, finding that his decision was knowingly and willingly made.

Our review of the lengthy colloquy between the trial court and defendant reflects that defendant was thoroughly advised of the dangers of self-representation, that he understood those dangers, and that he nonetheless wished to represent himself. Accordingly, we find that defendant's waiver of his right to counsel was knowingly, intelligently, and voluntarily made, and the assertion of the right to represent himself was clear and unequivocal. We further note, as did the trial court, that defendant did an excellent job representing himself.

Based on the foregoing, this assigned error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assigned error, defendant contends that the trial court erred when it discharged a sworn juror during the taking of evidence, over his objection, where the record does not support the conclusion that the juror was unqualified or otherwise incapable of serving impartially. Defendant specifically challenges the removal of juror Lydia Young, who was removed during the trial after the State advised the trial court of information it had received that this juror had a closer

relationship with defendant's mother than originally indicated during voir dire. Defense counsel maintains that the removal of the sworn juror over defendant's objection was error mandating reversal and remand for a new trial.

The record reflects that during voir dire, in response to questioning by the trial court, Lydia Young indicated that she knew defendant and that she had knowledge of the case. Prior to striking and selecting the jury, the parties and the court spoke to Ms. Young individually. During that conference, Ms. Young was asked to explain what she thought she knew or how she thought she knew defendant. Ms. Young explained: "I kind of know his family, and if I know Gene, it's just in passing. It's not like we sat down and had lunch or, you know, anything together. But, I am familiar with the name." Ms. Young also stated that she heard "on the street" that this case involved some type of sexual act between defendant and a female, that he used "some type of instrument or something," and at the time she heard it, "it was automatically assumed" that defendant "was guilty of something." Ms. Young asserted however that the talk "on the street" would not influence her decision and that she could look at the evidence and make an impartial decision based on what was presented to her. During questioning by the State during this conference, Ms. Young acknowledged that she knows defendant's mother, that it was not his mother who told her what happened, and she is "almost certain" that she knows J.T. and also knows her mother, but that she had no communication with her about this case. The exchange concluded as follows:

> **The State**: And you believe that whatever you heard on the street, good, bad or in-between, you can put that aside and make your decision based on what's presented in the case if you're chosen as a jury member?

> **Ms**. **Young**: Yes, because until I saw him today, I didn't even know everything went forward with that.

The minute entry from voir dire reflects that the State attempted to challenge Ms. Young for cause and that the trial court denied that challenge. Ms. Young was

thereafter accepted and sworn in as a juror. Later, on the second day of trial, during the testimony of the State's last witness, Captain Julie Scioneaux, the trial court had to take a brief recess based on information that the State had just received. At that time, the following took place:

**The State:** It's been informed to me that one of the jurors, Ms. Young, apparently she's been hanging out the last couple weekends with Mr. Franklin's mother, going out to the club and they have a close relationship. We asked her that originally in the questioning. She wasn't -- well we believe she wasn't honest. Our victim just told me, she said, this lady has been making eye contact, having some communicating with the -- Mr. Franklin's mother in -- in the audience. They're always hanging out. Every weekend they're in the club together. That raises some serious concern. We wanted her off from the getgo. But if that's going to be the type of juror we have -- we got two alternates. I think she needs to be excused. It's down to our last witness. We're not going to have two people get sick. I think she needs to be excused.

**The Court**: How do you respond to that.

**Defendant**: Your honor, I feel that Ms. -- what's her name, Ms. --

**The State**: Ms. Young.

**Defendant**: I feel Ms. Young answer truthfully as to she might know my mother. But Ms. Jones[4] don't know me. It don't matter if Ms. Jones have probably seen my mother. She said she know J.T. She say she know S.T. also. She knows those just as well, but do she know me. She don't know me, so if he saying that she's trying to be biased, or she going to be prejudiced towards the outcome of the -- the case, I could state that the case been biased from day one. (internal footnote added).

The trial judge asked if they wanted to question Ms. Young outside of the jury. The following occurred:

**The State**: My concern is, if she wasn't truthful in voir dire, she's not going to be truthful here. It's been brought to my attention she's been having some visual contact with his mother throughout the trial, so if she's not honest, she's just going to lie to me if I question her. We've got two

---

[4] It appears that defendant incorrectly referred to Ms. Young as Ms. Jones.

alternates. She should be removed and one of the alternates placed in her position.

**Defendant**: Still, your honor --

**The State**: If this thing -- we shouldn't have to do this a third time because a juror was untruthful.

**Defendant**: Excuse me, your honor. As for the State, can he state who told him that?

**The Court**: He already said who said it.

**Defendant**: Who told him that -- what the name is?

**The State**: The victim.

**Defendant**: Oh, J.T. told you that?

**The State**: Just pulled me out of court and told me that.

**Defendant**: So she just pulled you out and told you that Ms. Jones -- so what she was in the club with Ms. Jones also. How could -- did she verify that by seeing that?

**The Court**: Ms. Young.

**Defendant**: Ms. Young. J.T. was in the club withy [sic] Ms. Young also, or are you just saying that she saying that someone told her?

**The State**: J.T. is not on the jury. This lady's going to be asked to -- to make a ruling.

**Defendant**: But you -- you giving information about you saying what J.T. told you. Was J.T. there too also, if you say in the club --

**The State**: It's not fair to have a --

**Defendant**: To be in the club you have to be present.

**The State**: It's not fair to have her on the jury after she was not truthful in her questioning. She's not going to be truthful if we ask her one question or ten questions.

**The Court**: Okay. I need to think about this. Y'all step back for a moment.

**The State**: And just for the court's information, this was just brought to my attention. That's why I walked outside. This is not something I've been knowing about.

The court then had Ms. Young sworn in and questioned her. The judge confirmed with Ms. Young that she knew defendant's mother. She denied socializing with her "out at the club or anything like that." She stated that she had not spent time with defendant's mother in the last few weeks. When Ms. Young was asked how well she knew her, Ms. Young stated, "One of my cousins is for, I think, one of her other sons or whatever." Ms. Young denied making eye contact with defendant's mother during trial but acknowledged that she knew who she was. She indicated that she "just now" noticed her in the courtroom. When the judge noted that there were not many people in the room, Ms. Young stated, "Well, my concentration is up here, and then I'm looking if that's her right here with the blue on, I'm not familiar with that hairstyle."

The prosecution and defense indicated they had no questions for Ms. Young. Following an exchange among the judge, defendant, and the State, the trial court granted the State's motion to remove Ms. Young as a juror and replaced her with an alternate over defendant's objection. The trial then continued with an alternate in Ms. Young's place.

Defendant now contends that the trial court's removal of this juror over his objections warrants reversal and a remand for new trial. On appeal, defendant points out that the issue of the acquaintance was known to the State and the trial court before the juror was accepted and sworn, and that the prosecutor's statements about this juror's alleged relationship with defendant's mother were an insufficient basis upon which to remove her during the presentation of the trial testimony. Defense counsel asserts that no evidence was received to show that this juror and defendant's mother socialized, to show improper courtroom behavior, or to show a lack of impartiality on the part of the juror.

The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that jurors be fair and unbiased. *State v. Tatum*, 09-1004 (La. App. 5 Cir. 5/25/10), 40 So.3d 1082, 1092. A juror's disclosure during trial that the juror knows or is related to a witness or the victim is not sufficient to disqualify that juror, unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. *State v. Tatum*, 40 So.3d at 1092. Further, a trial court may only remove a juror for cause when his relationship with the defendant would influence the juror's ability to arrive at an impartial verdict. *State v. Landrieu*, 18-964 (La. App. 4 Cir. 6/12/19), 274 So.3d 661, 674, *writ denied*, 19-1148 (La. 3/9/20), 307 So.3d 1028. A trial court has great discretion in ruling on the qualifications for a juror to serve, and its ruling should not be disturbed unless the reviewing court finds a clear abuse of this discretion. *State v. Simmons*, 18-640 (La. App. 5 Cir. 10/9/19), 282 So.3d 353, 359.

After the first witness is sworn, La. C.Cr.P. art. 789 provides for the replacement of a juror with an alternate juror in the event a juror becomes unable to serve or is disqualified. *State v. Simmons*, 282 So.3d at 358, n.6; *State v. Derouselle*, 99-3283 (La. 4/28/00), 761 So.2d 1269, 1270 (*per curiam*); *State v. Fuller,* 454 So.2d 119, 123 (La. 1984); *State v. Gabriel*, 542 So.2d 528, 533 (La. App. 5th Cir. 1989), *writ denied*, 558 So.2d 566 (La. 1990). The trial court has the discretion to utilize the service of an alternate juror, rather than to grant a mistrial, upon a proper finding that this is the best course of action. *State v. Fuller*, 454 So.2d at 123; *State v. Tatum*, 40 So.3d at 1093. In *State v. Marshall*, 410 So.2d 1116 (La. 1982), the Louisiana Supreme Court held that the trial court correctly discharged a juror who, after being sworn, was determined to be "not impartial," as

"unable to perform or disqualified from performing" her duty under La. C.Cr.P. art. 789.

In *State v. Orphey*, 20-167 (La. App. 3 Cir. 10/28/20), 306 So.3d 550, *writs denied*, 20-1374 (La. 3/9/21), 312 So.3d 585, and 20-1473 (La. 3/9/21), 312 So.3d 587, the appellate court found no abuse of discretion in the trial court's removal of a juror and replacement with an alternate over the defendant's objection. In that case, on the second day of trial, a juror brought to the court's attention that she worked with a woman who walked into the courtroom during trial. The woman was the defendant's mother, and pursuant to questioning by the court, the juror indicated that knowing the woman made her uncomfortable and that she was not sure whether knowing the woman would prevent her from doing her job as a juror. The juror ultimately said that although it would be difficult, she would do what the law required in deciding the case. The trial court excused this juror because "it's too close a relationship." Defendant objected and, on appeal, argued that the trial court erred in removing and replacing the juror because she was neither "unable to perform" nor "disqualified from performing" her duties as a juror. In finding that the trial court did not abuse its discretion in removing the juror, the appellate court in *Orphey* noted that the trial court was in the unique position of not only hearing the response of the juror in answering the questions, but also being able to observe the manner in which the answer was given, the tone of the juror's voice, and the juror's overall demeanor, and then, based on these observations, determined there was a real potential for bias.

Likewise, we find that the trial court did not abuse its discretion in removing Ms. Young as a juror and replacing her with a duly qualified alternate. After the State informed the trial court about the new information it had received, the trial court had Ms. Young sworn in and questioned her about the allegations that she recently socialized with defendant's mother at the club and that they had been

making eye contact during trial. During that questioning, Ms. Young denied that she went to the club or spent recent weekends with defendant's mother or that they made eye contact. The court was able to not only hear Ms. Young's responses but also to observe the manner in which her answers were given, the tone of her voice, and her overall demeanor. We acknowledge that the questioning of this juror was inadequate insofar as she was not asked about her ability to be impartial when the issues regarding the extent of her relationship with defendant's mother and eye contact between them arose. Additionally, the trial court should have questioned J.T. regarding the source of her information regarding the socialization with and relationship between defendant's mother and Ms. Young.

However, despite these omissions, the trial court, which was able to observe Ms. Young's overall demeanor while answering the questions, obviously believed that there may have been a real potential for bias. Further, the trial judge was trying to protect the proceedings from potential error by replacing Ms. Young. During the additional questioning of Ms. Young, her response that "[o]ne of my cousins is for, I think, one of her other sons or whatever," appears to suggest that there might be some familial relationship between her family and defendant's family. The trial court seemed to acknowledge just prior to its ruling that there might be a closer relationship than previously thought, and in light of that, the trial court could have reasonably believed that these allegations cast Ms. Young's prior responses in a new light and presented a new basis to remove Ms. Young.

We lastly note that this issue involves the trial court's exercise of its discretion to remove an allegedly biased juror over the objection of defendant, rather than the trial court's exercise of its discretion to retain an allegedly biased juror over the objection of defendant. Defendant makes no allegation of bias on the part of the alternate juror who replaced Ms. Young. Therefore, even if the trial court, in its personal observations of Ms. Young's demeanor upon further

questioning, was incorrect in its assessment of the potential bias of Ms. Young, defendant was not disadvantaged by Ms. Young's removal because she was replaced with another allegedly impartial juror.

In light of the foregoing, we find no abuse of discretion in the trial court's removal of Ms. Young from the jury. Accordingly, the arguments raised in this assigned error are without merit.

**ERRORS PATENT REVIEW**

We have reviewed the record for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). Our review reveals an error in the State of Louisiana Uniform Commitment Order (UCO) insofar as the UCO from the enhanced sentencing proceeding does not include as a "Sentence Condition" on the form that defendant shall comply with the Sex Offender Registration statute under La. C.Cr.P. art. 895 and La. R.S. 15:541, *et seq*. The record indicates that the trial court did, in fact, inform defendant that he was required to comply with the sex offender notification and registration requirements, and a written copy is included with the record. To ensure accuracy in the record, we remand this matter to the trial court to correct the UCO from the multiple offender sentencing proceeding to reflect that defendant shall comply with the Sex Offender Registration statute.[5] We further direct the Clerk of Court for the Twenty-Third Judicial District Court to transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. *See State v. Carriere*, 19-366 (La. App. 5 Cir. 12/26/19), 289 So.3d 149, 153.

---

[5] We note that the UCO from defendant's original sentencing proceeding also fails to reflect, as a sentence condition, that the trial court informed defendant that he had to comply with the sex offender registration requirements. However, this sentence was vacated prior to the imposition of the enhanced sentence.

Accordingly, for the reasons set forth herein, we affirm defendant's conviction and sentence and remand the matter for correction of an error patent as noted herein.

**<u>AFFIRMED; REMANDED FOR</u>**
**<u>CORRECTION OF ERROR PATENT</u>**

STATE OF LOUISIANA                    NO. 21-KA-531

VERSUS                                FIFTH CIRCUIT

GENE FRANKLIN, JR.                    COURT OF APPEAL

                                      STATE OF LOUISIANA

## WICKER, J., CONCURS WITH REASONS

I agree with the writer's opinion in this case as to both the thorough analysis and the outcome. I nevertheless concur as to the issue of the trial court's removal of juror Lydia Young only to point out my concerns with the manner in which the prosecutor and court handled this issue in several respects.

Specifically, I agree that the trial court has great discretion in ruling on a juror's qualifications to serve and that the reviewing court may not disturb that ruling unless the appellate court finds a clear abuse of discretion. *State v. Simmons,* 18-640 (La. App. 5 Cir. 10/9/19), 282 So.3d 353, 359. I also agree that only the trial court is able to observe the juror's manner in answering questions, overall demeanor, and tone of voice.  Furthermore, La. C.Cr.P. art. 789 clearly permits the replacement of a seated juror with an alternate when the juror has become physically unable to serve, has otherwise become disqualified, or has exhibited a real or potential for bias.

Nevertheless, I feel constrained to point out several issues. First, during the original voir dire Ms. Young informed the parties that she knew both the defendant and victim's families.  Armed with that information, however, the State remained brief in both its original and follow-up voir dire of Ms. Young. While the State had information which should have put it on notice at that point to inquire further in detail, the State did not. Thereafter, the State challenged Ms. Young for cause, which the trial court denied.  The State did not then use a peremptory challenge to

strike Ms. Young. While the trial court minutes are exceedingly difficult to read, on close inspection it appears that at the time Ms. Young was seated the State had unused peremptory challenges remaining. It also appears that at the time voir dire concluded the State had still unused peremptory challenges.

As discussed by the writer, thereafter, on the second day of trial before calling its last witness, the State informed the court that the victim, J.T., had informed the State of specific details about Ms. Young's relationship with the defendant's mother and that she had observed what appeared to her to be troubling interaction between Ms. Young and Mr. Franklin's mother during the trial. When the trial judge called Ms. Young to the stand to query her regarding the State's concerns, the State declined to question Ms. Young, leaving that to the judge. While the judge questioned Ms. Young, as discussed by the writer, the judge failed to ask Ms. Young about her ability to be impartial in the face of her relationship with the defendant's mother and the midtrial alleged eye contact.

Furthermore, while J.T. was present in court, neither the State nor the judge called J.T. to the stand to question her about the source of her comments about Ms. Young's relationship with and alleged social interactions with the defendant's mother just prior to the trial, nor about her observations of the alleged interaction between Ms. Young and the defendant's mother during the trial. Also, while the defendant's mother appears to have been present at trial, neither the State nor the court called her to the stand to question her about either her relationship with Ms. Young or her alleged midtrial eye contact with the juror. The judge also did not query the State about whether J.T.'s mother was present at the trial to be questioned.

Next, the State, in arguing for Ms. Young's removal, primarily argued "with two alternates, it doesn't harm anybody by excusing Ms. Young and bringing one of the alternates."

Finally, before removing Ms. Young the trial court made no explicit finding that in her opinion Ms. Young had exhibited real or potential bias. While the law requires that jurors be fair and unbiased, it does not require that the jury be composed of individuals who are totally unacquainted with the defendant or victim. *State v. Simmons*, 18-640 (La. App. 5 Cir. 10/9/19), 282 So.3d 353 citing *State v. Williams*, 00-1134 (La. App. 5 Cir. 3/28/01), 783 So.2d 566, 567. A juror's disclosure during trial that the juror knows the defendant or the victim is not sufficient to disqualify that juror, unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. *Id.*, citing *State v. Holland*, 544 So.2d 461, 465 (La. App. 2 Cir. 1989), *writ denied*, 567 So.2d 93 (La. 1990). The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. *Id.* While La. C.Cr.P. art. 789 clearly provides for the replacement of a juror with an alternate juror when the juror becomes unable to serve or is disqualified, the original juror must first be found unable to serve or disqualified before that juror may be replaced with an alternate. *State v. Fuller,* 454 So.2d 119 (La. 1984). Given the trial court's broad discretion on this issue, I cannot say that the trial court erred in removing Ms. Young and replacing her with an alternate. Nevertheless, neither the State nor the trial court was exemplary in the manner in which it addressed this issue.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
INTERIM CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**MAY 11, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 21-KA-531

## E-NOTIFIED

23RD JUDICIAL DISTRICT COURT (CLERK)
HON. KATHERINE TESS STROMBERG (DISTRICT JUDGE)
DONALD D. CANDELL (APPELLEE)          LINDSEY D. MANDA (APPELLEE)

## MAILED

HONORABLE RICKY L. BABIN
(APPELLEE)
DISTRICT ATTORNEY
23RD JUDICIAL DISTRICT COURT
POST OFFICE BOX 66
CONVENT, LA 70723

BRUCE G. WHITTAKER (APPELLANT)
ATTORNEY AT LAW
LOUISIANA APPELLATE PROJECT
1215 PRYTANIA STREET
SUITE 332
NEW ORLEANS, LA 70130